UNITED STATES, Appellee

v.

Richard G. OUTHIER, Private
First Class, U.S. Marine
Corps, Appellant.

No. 95–0832.
Crim. App. No. 94–1468.

U.S. Court of Appeals for
the Armed Forces.

Argued May 7, 1996.

Decided Sept. 30, 1996.

For Appellant: *Commander Mary T. Hall,* JAGC, USN (argued); *Commander Carol J. Cooper,* JAGC, USN (on brief).

For Appellee: *Lieutenant Andrew J. Waghorn,* JAGC, USN (argued); *Colonel Charles Wm. Dorman,* USMC and *Commander D.H. Myers,* JAGC, USN (on brief).

## Opinion of the Court

COX, Chief Judge:

Appellant was tried by general court-martial, military judge alone, at Camp Pendleton, California, on February 8, 1994. Pursuant to his pleas, he was found guilty of unauthorized absence, making a false official statement (4 specifications), aggravated assault, impersonating an officer, and wrongfully wearing insignia, in violation of Articles 86, 107, 128, and 134, Uniform Code of Military Justice, 10 USC §§ 886, 907, 928, and 934, respectively. He was sentenced to a dishonorable discharge, confinement for 2 years, total forfeitures, and reduction to E–1. The convening authority approved the sentence but, pursuant to a pretrial agreement, suspended execution of all confinement from the date of his action. The Court of Criminal Appeals affirmed the findings and sentence as adjudged. 42 MJ 626 (1995).

We granted review of the following issue:

WHETHER THE NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS ERRED IN EXTENDING THE COURT'S STANDARD FOR LIKELIHOOD OF DEATH OR GRIEVOUS BODILY HARM IN HIV AGGRAVATED ASSAULT CASES TO THIS NON–HIV ASSAULT CASE.

## FACTS

Appellant was an E–2 and an unauthorized absentee from the Marine Corps, officially stationed at Camp Pendleton, California. On or about September 22, 1993, while an unauthorized absentee, he returned to his hometown area and reported in to the United States Naval Academy in Annapolis, Maryland. Upon arrival, he posed as a Hospital Corpsman Petty Officer Second Class (HM2) named Jonathan Vincent Valjean.[1] Appellant made various false representations to military personnel, both in official and social capacities, the most significant of which was that he was a qualified Navy SEAL and hospital corpsman who was present on no-cost orders to recruit SEALS. During his visit to the Naval Academy, he met and befriended Officer–Candidate–Seaman (OCSN) Anthony R. Avila, who was stationed at the Naval Academy on active duty with the United States Navy. The two met while working out in the pool area of the fitness complex on base. OCSN Avila was at the pool practicing his swimming skills since he desired to attend Basic Underwater Demolition/SEAL (BUDS) school in order to ultimately become a Navy SEAL. Appellant then represented to OCSN Avila that he was a qualified Navy SEAL and corpsman, and that he was an expert in "drownproofing" techniques.

OCSN Avila was interested in improving his skills, and after talking with appellant and relying on his credentials, he agreed to participate in a drownproofing exercise to better prepare himself to become a Navy SEAL. This exercise consists of being bound at the hands and feet, and then jumping into the deep end of a swimming pool. The bound individual is then supposed to expel the air from his lungs, sink to the bottom of the pool, and push off the bottom of the pool to the top of the water surface to again inhale and repeatedly complete this sequence of events. This exercise is intended to make the individual comfortable in the water and less prone to panic in an emergency situation. It is required training at BUDS school.

Appellant, although not certified as he originally represented, was a capable swimmer and paramedic prior to his enlistment in

---

1. The United States Navy–Marine Corps Court of Criminal Appeals pointed out in their opinion that appellant called himself "HM2 Jonathan (Jon) Valjean." As students of French literature will recognize, Jean Valjean (pronounced zhã væl-zhã) is the protagonist in Victor Hugo's *Les Misérables.* The court below notes that the record suggests that appellant pronounced his fictitious name by its correct pronunciation. 42 MJ 626, 629 n. 3 (1995).

the Marine Corps. He had completed courses in scuba diving, water survival, and providing emergency medical care.

After securing OCSN Avila's consent under false pretenses, appellant practiced with him before the exercise. OCSN Avila testified during sentencing that they practiced the 500–meter swim a few times, the underwater 50–meter swim, and the "eggbeaters"[2] the full day prior to the exercise. Additionally, during the exercise itself, appellant remained in the immediate vicinity of the pool above OCSN Avila, wearing goggles, and keeping a life preserver nearby.

OCSN Avila completed the exercise successfully and was not injured in any way.

## DISCUSSION

■ Appellant urges this Court to reverse his conviction for aggravated assault because the Court of Criminal Appeals used the wrong standard, one that was allegedly lesser than what is required· to prove "likely to produce death or grievous bodily harm" for the "aggravated" element of the assault. *See* para. 54b(4)(a)(iv), Part IV, Manual for Courts–Martial, United States (1995 ed.). Appellant contends that the court below mistakenly applied the standard from *United States v. Joseph*, 37 MJ 392 (CMA 1993), dealing with the consequences of exposure to HIV infection, to this non-HIV case. We reject that contention. There is only one standard: Whether the means used were "likely to produce death or grievous bodily harm."

This Court has applied one consistent standard when evaluating different "means likely." In *Joseph*, we addressed the question whether the virus that causes AIDS could be considered "a means or force likely to produce death or grievous bodily harm" for purposes of a conviction for aggravated assault. We concluded that the ultimate consequences of exposure to the virus, combined with the

lack of control that an accused has over the virus' effects once the "touching" has occurred, constitute the "means likely" required for conviction of aggravated assault.

In *United States v. Vigil*, 3 USCMA 474, 13 CMR 30 (1953), we addressed the question whether "a fist" could be the means likely to produce death or grievous bodily harm. The circumstances of that case prompted the Court, led by Chief Judge Quinn, to hold that a fist, when used in such a brutal manner as the accused in that case had, could be the means likely to produce death or grievous bodily harm. Vigil used gloved fists to beat a sleeping victim who lost eleven teeth; suffered two blackened and completely swollen eyes; sustained fractures of the nose, cheekbones, upper jaw, and lower jaw; and suffered various other cuts, scrapes, bruising and swelling. This standard of likelihood for causing grievous injuries or death is no different from that used in *Joseph*. Compare *United States v. Vigil*, with *United States v. Joseph*, both *supra*. Therefore, we resolve the granted issue against appellant.

However, our inquiry does not end there. There is a much more troublesome issue in this case. The plea in this case was substantially contradicted by facts brought out during sentencing, particularly from Avila's testimony. Because this matter was not adequately resolved by the military judge, we hold that the plea was rendered improvident. Art. 45(a), UCMJ, 10 USC § 845(a).

The question is whether appellant's pleas conform as a matter of law to the direction set out in Article 45(a), as follows:

If an accused after arraignment makes an irregular pleading, **or after a plea of guilty sets up matter inconsistent with the plea,** or if it appears that he has entered the plea of guilty improvidently or through lack of understanding of its meaning and effect, or if he fails or refuses to plead, a plea of not guilty shall be entered

---

2. Eggbeaters are pool exercises in which one kicks the legs in high-speed fashion to propel one's body out of the water, just as if treading water, only at a much faster pace which makes the exercise more difficult. The exercise provides great leg strength, and is designed to train the individual to swim competently in deep water. The resultant froth of the water caused by the beating action resembles beaten eggs, and the legs are churning as if they were mechanical mixers. Hence, the term "eggbeaters" was coined for the exercise.

in the record, and the court shall proceed as though he had pleaded not guilty.

(Emphasis added.)

The elements of aggravated assault for an "[a]ssault with a ... means o[r] force likely to produce death or grievous bodily harm," are as follows:

(i) That the accused attempted to do, offered to do, or did bodily harm to a certain person;

(ii) That the accused did so with a certain weapon, means, or force;

(iii) That the attempt, offer, or bodily harm was done with unlawful force or violence; and

(iv) That the weapon, means, or force was used in a manner likely to produce death or grievous bodily harm.

Para. 54b(4)(a), Part IV, Manual, *supra.*

"Grievous bodily harm" is defined as "serious bodily injury. It does not include minor injuries, such as a black eye or a bloody nose, but does include fractured or dislocated bones, deep cuts, torn members of the body, serious damage to internal organs, and other serious bodily injuries." Para. 54c(4)(a)(iii). However, "[i]t is not necessary that death or grievous bodily harm be actually inflicted to prove assault with a dangerous weapon or means likely to produce grievous bodily harm." Para. 54c(4)(a)(iv). The Manual also provides: "The phrase 'other means or force' may include any means or instrumentality not normally considered a weapon. When the natural and probable consequence of a particular use of any means or force would be death or grievous bodily harm, it may be inferred that the means or force is 'likely' to produce that result...." Para. 54c(4)(a)(ii).

While it is well-settled that there is no requirement to prove motive or intent on the part of the aggressor or to prove any resultant injury or harm in order to prove aggravated assault, we recognize that these circumstances frequently provide the lynch-pin between a means that is used in a manner "likely" to produce death or grievous bodily harm and one that is not. *See United States v. Vigil, supra.* The "means" in *Vigil* were unique for an aggravated assault case, *i.e.*, a fist. In this case, the "means" were also distinctive in that the manner of assault was binding another's hands and feet and then permitting the person to jump into the deep end of a swimming pool. Regardless, the standard remains the same. The question is whether the means were "used **in a manner likely** to produce death or grievous bodily harm." Para. 54b.(4)(a)(iv) (emphasis added). Thus, in this instance, the circumstances define whether the means used were employed in a manner likely to cause grievous bodily harm or whether appellant's actions were performed in such a manner that the natural and probable consequences were necessarily death or grievous bodily harm.

■ Here, the question is whether appellant's actions of binding OCSN Avila's hands and feet, and then allowing him to jump into the deep end of a swimming pool, placed OCSN Avila in danger of losing his life or suffering substantial injury so as to constitute an aggravated assault under the circumstances.

Without prior training, preparation, or physical conditioning, this act most certainly could have resulted in death or grievous bodily harm. Even one with training might suffer these consequences if adequate supervision and assistance were not supplied. However, whether the threat of death or grievous harm is real, or whether it is merely speculative, depends on the circumstances. Here, the record shows that appellant was by the edge of the pool, had a life preserver handy, and trained OCSN Avila for an entire day. Moreover, evidence also suggests that OCSN Avila was not a novice swimmer. In fact, OCSN Avila met appellant at the Naval Academy pool and communicated his desires to train with an eye toward becoming a SEAL. He was at the pool ostensibly training to achieve that goal. Although duped as to appellant's true identity, OCSN Avila was well-aware of what the drownproofing exercise entailed. He therefore understood the nature of the physical challenges under which he was placing himself. He was also aware of the fact that this exercise was not part of any officially sanctioned program, and that he was not obligated to participate if he so chose. He understood that the impostor,

HM2 Jon Valjean, was volunteering his own time and was not officially gathering participants in a planned military exercise. Under these circumstances, we cannot hold that the plea provided factual support for the conclusion that appellant's actions were likely to result in death or grievous bodily harm. In fact, no harm occurred.

In his dissent below, Judge DeCicco of the Court of Criminal Appeals pointed out that during the providence inquiry, the military judge addressed the question of a "means likely to produce death or grievous bodily harm" as follows:

> MJ: And under the circumstances, with you not being trained in drownproofing techniques, are you satisfied in your own mind that you created a means or force likely to cause him to drown?
>
> ACCUSED: Yes, sir.
>
> MJ: And that drowning would have produced grievous bodily harm?
>
> ACCUSED: Yes, sir.

42 MJ at 634.

First, this colloquy elicits little from appellant as far as the reasons why this particular exercise was conducted in a manner that was likely to produce death or grievous bodily harm. The questions posed by the military judge turned on appellant's qualifications, rather than the way in which the exercise was performed. Additionally, appellant's official qualifications or lack thereof is relevant only as to any possible consent defense. The issue of consent was never reached because one cannot consent to an act which is likely to produce grievous bodily harm or death. 42 MJ at 632, *citing* R. PERKINS & R. BOYCE [hereafter PERKINS & BOYCE], CRIMINAL LAW 155 (3d ed. 1982); *see also United States v. Brantner*, 28 MJ 941, 944 (NMCMR 1989).

The lack of qualifications, as opposed to ability, does not automatically warrant the conclusion that death or grievous bodily harm was likely to result from appellant's actions.

Judge DeCicco concluded, however, that the evidence supported a conviction for the lesser-included offense of assault consummated by a battery. *See* para. 54d(6), Part IV, Manual, *supra*. Again, resolution of this question is not so simple. The answer depends upon whether OCSN Avila validly consented to the exercise, thus providing an absolute defense to the lesser-included offense of assault consummated by a battery. The real issue is whether appellant's misrepresentation as to his true identity was fraud in the inducement or fraud in the *factum*. Fraud in the inducement does not necessarily invalidate consent, especially in a simple assault and battery situation, whereas fraud in the *factum* goes to the heart of the nature of the consent, and will invalidate any consent so given. *See, e.g., United States v. Booker*, 25 MJ 114 (CMA 1987) (In rape cases, fraud in the *factum* vitiates consent to sexual intercourse, but fraud in the inducement does not. The validity of a victim's consent in a rape case turns upon whether the victim was consenting to sexual intercourse with a particular person, although not knowing his true identity, *i.e.,* "fraud in the *factum*," or whether the victim was tricked into consenting to sexual acts because of collateral matters such as fraudulent representations of the accused, like "of course I will still love you in the morning," *i.e.,* "fraud in the inducement." The former is not a valid consent; the latter is.)

The rule of consent in cases of battery is similar, although not the same, since "without her consent" is an element of rape that is not an element of assault consummated by a battery. *Compare* Art. 120, UCMJ, 10 USC § 920, *with* Art. 128; *see generally* PERKINS & BOYCE, *supra* at 1074. As those authors state: "The general rule is that if deception causes a misunderstanding as to the fact itself (fraud in the *factum* ) there is no legally-recognized consent because what happened is not that for which consent was given; whereas consent induced by fraud is as effective as any other consent, so far as direct and immediate legal consequences are concerned, if the deception relates not to the thing done but merely to some collateral matter (fraud in the inducement)." PERKINS & BOYCE, *supra* at 1079.

However, the discussion in PERKINS & BOYCE continues by saying:

[S]ince the definition of criminal battery is not an application of force to the person of another *without his consent,* but an *unlawful* application of force to the person of another, it follows that the decisive question is not whether the harmful contact was with or without consent, but whether it was lawful or unlawful. And just as a harmful contact with consent not induced by fraud may be unlawful in a particular case for one reason, so a harmful contact with consent induced by fraud may be unlawful in another case for a different reason. In other words, consent procured by fraud in the inducement presents an entirely different problem in a prosecution for battery (or assault) than it does in a prosecution for an offense in which *lack of consent* is *per se* essential to guilt.

*Id.* at 1082 (footnote omitted.)

Whether consent obtained by fraud can be a defense to assault consummated by a battery is a question of fact which must be resolved by factfinders or addressed and resolved when raised during a guilty-plea inquiry. Here, the question of fact for inquiry by the military judge was whether the consent given by OCSN Avila was sufficient, although perhaps obtained by inducement, to be a complete defense to an assault consummated by a battery.

OCSN Avila consented to practice a military exercise believing his instructor to be certified and qualified as a SEAL and Navy corpsman, when in fact he was not. We distinguish this case from *United States v. Brantner, supra.* Brantner was convicted, pursuant to his pleas, of various offenses to include aggravated assault arising from his conduct while a Marine Corps recruiter in rural Oregon. He told recruits that he was authorized to conduct "medical procedures" which would hasten the recruiting process. The procedures employed by Brantner included hernia examinations in which he fondled recruits' genitalia; masturbation of recruits to obtain sperm samples; use of unsterilized needles to inject water into recruits' buttocks; and use of an unsterilized needle to obtain fluid from a recruit's scrotum and to draw blood from a vein in a recruit's penis. His con-

victions for aggravated assault arose out of his use of unsterilized needles. A detailed stipulation of fact was entered into by Brantner in which he admitted that unsterilized needles were a means by which death or grievous bodily harm was likely to result. The Navy–Marine Corps Court of Military Review (now the Court of Criminal Appeals) affirmed the convictions for aggravated assault. 28 MJ at 943–44.

Here, there is no detailed stipulation of fact that was entered into to explain why appellant's actions were likely to cause death or grievous bodily harm. In *Brantner,* the stipulation of fact left no question that the means were of a type likely to produce death or grievous bodily harm. Moreover, in *Brantner,* the recruits acquiesced in the acts perpetrated by that accused because of a belief that the acts were required during the enlistment process and were administered under the guise of authority. No such situation exists in this case. In fact, it is clear from the facts that OCSN Avila knew exactly what was going to happen and exactly why he was practicing this exercise. He was only falsely misled as to the qualifications of the person administering the exercise. The exercise was conducted during OCSN Avila's off-duty time. He was in no way coerced, either explicitly or implicitly, to acquiesce in participating in these activities. The question remains as to how material and essential appellant's qualifications vice actual abilities are to the issue of consent. As a court of law, we do not answer that question of fact here. *See* Art. 67(c), UCMJ, 10 USC § 867(c) (1989).

█ Unlike the civilian criminal justice system, Article 45(a) requires that, in a guilty-plea case, inconsistencies and apparent defenses must be resolved by the military judge or the guilty pleas must be rejected. *United States v. Jemmings,* 1 MJ 414, 418 (CMA 1976); *United States v. Dunbar,* 20 USCMA 478, 43 CMR 318 (1971). Mere conclusions of law recited by an accused are insufficient to provide a factual basis for a guilty plea. *United States v. Terry,* 21 USCMA 442, 45 CMR 216 (1972).

In a sense, we agree with Judge DeCicco's dissent. Once the facts of this case were more fully developed by the defense during the sentencing portion of appellant's court-martial, which demonstrated that binding of the hands and feet and jumping into the deep end of a swimming pool were not means likely to produce death or grievous bodily harm, it was incumbent upon the military judge to reopen the providence inquiry to settle this disparity. Appellant had merely recited conclusions of law during the providence inquiry to the effect that his actions were "likely to produce death or grievous bodily harm" because, as he stated, as a result of his lack of training in drownproofing techniques, his actions might have resulted in drowning. However, appellant never was asked, and he did not state in his own words, why these means were likely to produce this result in this case. He also was not asked to expound on his training in this area. This was the point at which the major discrepancy arose and at which time it should have been laid to rest or lesser pleas accepted or not-guilty pleas entered and the Government required to introduce evidence to prove the offense. *See United States v. Newsome*, 35 MJ 749 (NMCMR 1992). Assuming that a simple assault and battery was to be considered, there was no inquiry made as to the consent given for this exercise or about what were the entire circumstances of how appellant obtained the same.

■ We hold that the record established matters inconsistent with appellant's plea to aggravated assault. We cannot uphold a conviction for the lesser-included offense of assault consummated by a battery because the issue of consent as a defense was not addressed during the plea inquiry. Art. 45(a).

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed as to Charge III and its specification (aggravated assault) and the sentence. The findings of guilty thereon are set aside. The record of trial is returned to the Judge Advocate General of the Navy for remand to that court, which may dismiss Charge III and reassess the sentence based on the remaining findings of guilty or authorize a rehearing on Charge III and the sentence.

Judge GIERKE and Senior Judge EVERETT concur.

SULLIVAN, Judge, with whom CRAWFORD, Judge, joins (dissenting):

Appellant pleaded guilty in this case, a key point. He admitted that he caused the victim "to jump into deep water with his hands and feet bound," and that the victim so bound was "helpless to swim or survive in the water." He further admitted that "under the circumstances, with [his] not being trained in drown proofing techniques ... [he] created a means or force likely to cause him to drown."

The thrust of the majority opinion is that the facts established during the sentencing hearing "substantially contradicted" the above admissions. It states, *inter alia:*

> Without prior training, preparation, or physical conditioning, this act most certainly could have resulted in death or grievous bodily harm. Even one with training might suffer these consequences if adequate supervision and assistance were not supplied. However, whether the threat of death or grievous harm is real, or whether it is merely speculative, depends on the circumstances. Here, the record shows that appellant was by the edge of the pool, had a life preserver handy, and trained OCSN Avila for an entire day. Moreover, evidence also suggests that OCSN Avila was not a novice swimmer.

45 MJ at 329.

For the following reasons, I see no fact contradiction or any legal error because of the military judge's failure to inquire into appellant's life saving experience.

A life preserver is of no help to a person at the bottom of a pool with his hands and legs tied. Moreover, swimming proficiency or even normal life saving techniques would not be particularly helpful in this extraordinarily hazardous situation. I agree with appellant's trial evaluations of these circumstances and see no basis to speculate further on his life saving training or expertise with respect to

the drown proofing exercise. The bottom line is that he was not qualified to conduct this special military training as he freely admitted. I would affirm. *See United States v. Harrison*, 26 MJ 474, 476 (CMA 1988) ("Post-trial speculation ... cannot be countenanced.").