**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Airman Basic GAVIN B. ATCHAK**
**United States Air Force**

**ACM 38526**

**10 August 2015**

Sentence adjudged 29 October 2013 by GCM convened at Seymour Johnson Air Force Base, North Carolina. Military Judge: Michael A. Lewis and Mark L. Allred (sitting alone).

Approved Sentence: Bad-conduct discharge, confinement for 36 months, and forfeiture of all pay and allowances.

Appellate Counsel for the Appellant: Captain Michael A. Schrama and Captain Travis L. Vaughan.

Appellate Counsel for the United States: Major Daniel J. Breen; Captain Thomas J. Alford; and Gerald R. Bruce, Esquire.

Before

MITCHELL, [1] HECKER, and TELLER
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

HECKER, Senior Judge:

---

[1] In a memorandum dated 2 February 2015, Lieutenant General Christopher F. Burne, The Judge Advocate General, designated Senior Judge Martin T. Mitchell as the Chief Appellate Military Judge in cases where Chief Judge Mark L. Allred served as the military trial judge or recused himself under the governing standards of judicial conduct. In this case, Chief Judge Allred served as the military trial judge. Therefore, he recused himself as Chief Appellate Judge, and Chief Judge Mitchell assigned the panel in this case.

A general court-martial composed of a military judge sitting alone convicted the appellant, consistent with his pleas, of dereliction of duty, violation of a lawful order, and aggravated assault, in violation of Articles 92 and 128, UCMJ, 10 U.S.C. §§ 892, 918.[2] The court sentenced him to a bad-conduct discharge, confinement for 36 months, and forfeiture of all pay and allowances. The convening authority approved the sentence as adjudged.

On appeal, the appellant contends (1) his pleas of guilty to aggravated assault are improvident, (2) the military judge erred by failing to grant appropriate relief for prosecutorial misconduct, and (3) certain actions by the trial counsel created the appearance of unlawful command influence. We find the record reflects a substantial basis in law and fact for questioning the appellant's pleas to aggravated assault.

*Background*

In August 2011, the appellant was informed he tested positive for the Human Immunodeficiency Virus (HIV). At that time, his commander served him with a "Preventative Measures Requirements Order" ("safe sex order") which required him to verbally inform sexual partners that he was HIV positive prior to engaging in sexual relations and to use proper methods to prevent the transfer of bodily fluids during those relations. The appellant acknowledged he had a duty to obey this order and understood violating the order may result in adverse administrative action or punishment under the UCMJ.

In early 2012, the appellant had a sexual encounter with Airman First Class ("A1C") W, whom he had become friends with several months earlier. The appellant provided the 19-year-old Airman with alcohol and both became intoxicated. At some point during the evening, the appellant placed A1C W's penis in his mouth. For this incident, the appellant pled guilty to dereliction of duty for providing alcohol to A1C W, violation of the safe sex order, and aggravated assault with a means likely to produce death or grievous bodily harm.

In July 2012, the appellant contacted another military member, A1C L, through a social networking application. On 17 July 2012 the appellant invited the 20-year-old A1C L to his dormitory room where the two drank alcohol. The appellant drank excessively and appeared uncoordinated. The two began kissing and then engaged in mutual oral sodomy. The appellant then engaged in anal intercourse with A1C L. A1C L and the appellant engaged in unprotected anal intercourse and oral sodomy with each other on several occasions over the next three days. The appellant pled guilty to violating

---

[2] For Specification 3 of Charge I, the appellant pled guilty to dereliction of duty for providing alcohol to an underage Airman, but the military judge found that plea to be improvident. The government then chose not to go forward with this specification and elected to withdraw and dismiss the specification.

the safe sex order during these encounters and two specifications of aggravated assault with a means likely to produce death or grievous bodily harm.

*Providence of Guilty Pleas*

We review a military judge's decision to accept a guilty plea for an abuse of discretion. *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008). In doing so, we apply a "substantial basis" test and consider whether there is evidence in the record that would raise a substantial question about the appellant's plea. *Id.* When reviewing a case on direct appeal, we apply the law at the time of appeal, not the time of trial. *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010).

For his involvement with the two Airmen, the appellant was charged with three specifications of aggravated assault by engaging in unprotected sexual activity while infected with HIV. That offense states that any person who commits an assault with a means or force likely to produce death or grievous bodily harm is guilty of aggravated assault. Article 128(b), UCMJ; *Manual for Courts-Martial* (*MCM*), Part IV, ¶ 54.a.(b) (2012 ed.). Each specification alleged that at a certain place and time, the appellant did "commit an assault upon [each victim] with a means likely to produce death or grievous bodily harm, to wit: engaging in unprotected [oral sodomy and/or anal intercourse] with him." Two of the specifications end with the following language: "while [the appellant] was infected with [HIV]." For the appellant's conduct with the Airman on 17 July 2012, the specification ends "without informing [the Airman] that [the appellant] was infected with [HIV]."

One element of these offenses required proof, therefore, that the risk of HIV transmission was "likely" to produce death or grievous bodily harm. The *MCM* further states, "When the natural and probable consequence of a particular use of any means or force would be death or grievous bodily harm, it may be inferred that the means or force is 'likely' to produce that result." *MCM*, Part IV, ¶ 54.c.(4)(a)(ii). Beginning in 1993, our superior court's precedent focused HIV cases exclusively on the likelihood that death or grievous bodily harm would occur in the event of transmission without consideration of whether the transmission risk itself was likely. *United States v. Joseph*, 37 M.J. 392, 396–97 (C.M.A. 1993). Correspondingly, that precedent held the risk of harm need only be "more than merely a fanciful, speculative, or remote possibility." *Id.*; *United States v. Klauck*, 47 M.J. 24, 25 (C.A.A.F. 1997); *United States v. Weatherspoon*, 49 M.J. 209, 210 (C.A.A.F. 1998). The military judge used these concepts and this language when explaining the elements of the offense to the appellant.[3]

---

[3] In pertinent part, the military judge told the appellant,

> The likelihood of death or grievous bodily harm is determined by measuring two factors. Those two factors are, one, the risk of harm, and two, the magnitude of harm. In evaluating the risk of the harm, the risk of death or grievous bodily

While this case was pending before us, however, our superior court decided *United States v. Gutierrez*, 74 M.J. 61 (C.A.A.F. 2015), which held this prior precedent relating to HIV exposure erroneously established a test that was inconsistent with the plain language of Article 128, UCMJ. *Id.* at 65. Instead, like in any other aggravated assault case, the question is whether grievous bodily harm was "the likely consequence of [the a]ppellant's sexual activity." *Id.* at 66. In that case, the estimated per-act probability of acquiring HIV from a sexual encounter was 1 in 500 and this risk was found insufficient to meet the standard. *Id.* at 68 (holding "an event is not 'likely' to occur when there is a 1-in-500 chance of occurrence"). Similarly, the court held a risk of "'almost zero' does not clear any reasonable threshold of probability," nor does a risk of transmission that was only "remotely possible." *Id.* at 66–68.

Here, the parties stipulated that the two Airmen are not HIV positive and did not contract any diseases from the appellant. They also stipulated:

> There are several factors that affect the risk of transmission, including the infected person's viral load, which is the quantity of HIV virus in their blood; the infected person's and the non-infected person's overall health; high risk behaviors; and the type of sexual encounter. The risk of transmission is a variant of viral load in that higher viral load is associated with greater risk of transmission. The accused's viral load is relatively low, but it is above the threshold of detection. The accused's viral load is one that indicates it *would be possible* to transmit the infection to a sexual partner. The risk of transmission is also influenced by both the infected person's overall health and the non-infected person's overall health. If either the infected person or the non-infected person has other sexually transmitted diseases or a concurring infection or sickness, the risk of transmission is increased.

(Emphasis added).

The stipulation of fact also incorporated by reference a handout from the Centers for Disease Control and Prevention (CDC) that provided the "estimated per-act

harm must be more than merely a fanciful, speculative, or remote possibility. . . . In evaluating the magnitude of the harm, the consequence of death or grievous bodily harm must be at least probable and not just possible; or, in other words, death or grievous bodily harm would be a natural and probable consequence of the accused's acts. Where the magnitude of harm is great, it may be found that the aggravated assault exists even though the risk of harm is statistically low.

probability of acquiring HIV" from an infected source for various forms of sexual activity.

*1.  Early 2012 Conduct*

In early 2012, the appellant placed A1C W's penis in his mouth after the two were drinking in the appellant's dormitory room.  A1C W was aware of the appellant's HIV status.  For this conduct, the appellant pled guilty to aggravated assault and failing to obey the safe sex order.

Both specifications related to the appellant placing his mouth on A1C W's penis without using any protection to prevent the transfer of bodily fluids.  According to the CDC, however, this conduct presented a "low" risk of transmitting HIV to the Airman.  The CDC information also indicated "HIV transmission through oral sex has been documented, but rare.  Accurate estimates of risk are not available."  Because the uncontroverted evidence is that the appellant's risk of transmitting HIV under all these circumstances was even lower than the risk found insufficient in *Gutierrez*, we conclude that the record before us clearly demonstrates that there is a substantial basis in law for questioning his plea to the aggravated assault specification.  *See United States v. Shavrnoch*, 49 M.J. 334, 338–39 (C.A.A.F. 1998) (stating that a conviction based upon a legal standard that does not constitute an offense is legally insufficient).

In *Gutierrez*, after setting aside the aggravated assault convictions, our superior court instead affirmed convictions for assault consummated by a battery as lesser-included offenses.  74 M.J. at 68.  Here, having found the appellant's pleas to aggravated assault improvident, we consider whether we can (or should) affirm findings of guilt to that lesser-included offense.  *See* Article 59(b), UCMJ, 10 U.S.C. § 859(b) ("Any reviewing authority with the power to approve or affirm a finding of guilty may approve or affirm, instead, so much of the finding as includes a lesser included offense."); *United States v. Mitchell*, 66 M.J. 176, 181 (C.A.A.F. 2008) (approving a lesser included offense where the appellant's admissions during the providence inquiry, along with the stipulation of fact, establish all the elements of that lesser offense).

Like the offense of aggravated assault, the offense of assault consummated by a battery requires that the accused did bodily harm with unlawful force or violence.  *MCM*, Part IV, ¶ 54.b.(2).  "'Bodily harm' means any offensive touching of another, however slight."  *Id.* at 54.c.(1)(a).  For the force or violence to be unlawful, "no legally cognizable reason [can] exist[] that would excuse or justify the contact."  *United States v. Bonner*, 70 M.J. 1, 3 (C.A.A.F. 2011).  For a battery, one of those legally cognizable reasons is the purported victim's consent.  *See United States v. Johnson*, 54 M.J. 67, 69 (C.A.A.F. 2000) (recognizing consent "can convert what might otherwise be offensive touching into nonoffensive touching").  In the HIV context, this must be "meaningful informed consent" where the participant is aware of his/her partner's HIV status.

*Gutierrez*, 74 M.J. at 68 (citing *R. v. Cuerrier*, [1998] 2 S.C.R. 371, 372 (Can.) ("Without disclosure of HIV status there cannot be a true consent.")).

In contrast, consent is not a defense to an aggravated assault specification. *See United States v. Bygrave*, 46 M.J. 491, 493 (C.A.A.F. 1997) (stating a victim cannot consent to an act which is likely to produce grievous bodily harm or death). Consistent with this concept, the military judge advised the appellant, "A victim may not lawfully consent to an assault in which a means is used in a manner likely to produce death or grievous bodily harm. Consent is not a defense even if the purported victim was informed of the risk of exposure to HIV prior to the act."

The stipulation of fact stated the appellant and A1C W both became intoxicated and ended up lying on a bed together. It further stated, "While [A1C W] was lying on the bed, he noticed [the appellant] had his mouth on his penis. [He] pushed the [appellant] off and left the . . . dorm[itory] room." During the guilty plea inquiry for this specification (and for the related order violation specification), the appellant simply stated he placed his mouth on the A1C W's penis while not using any protection. The military judge then informed the appellant, "You understand that even though whether or not he may have consented as this was going on, you understand that he could not lawfully consent under these circumstances? . . . That a person cannot give lawful consent to an aggravated assault." The appellant replied that he understood this concept.

Under these circumstances, we cannot uphold a conviction for the lesser-included offense of assault consummated by a battery because the issue of consent as a defense to that offense was not adequately explored with the appellant during the plea inquiry. *See United States v. Outhier*, 45 M.J. 326, 328 (C.A.A.F. 1996). Also, the record is not clear about whether the appellant engaged in sexual contact with A1C W while he was asleep and thus incapable of consenting, nor were the legal ramifications of contact with a sleeping person explained to the appellant.[4] Therefore, the finding of guilty for Specification 4 of Charge IV is set aside.

*2. Conduct on 17 July 2012*

On 17 July 2012, the appellant and A1C L engaged in mutual oral sodomy and the appellant engaged in anal intercourse with A1C L but did not ejaculate. The appellant did not use protection and had not informed A1C L about his HIV status. For this conduct, the appellant pled guilty to failing to obey the safe sex order and to aggravated assault.

---

[4] We recognize the appellant, as part of his pretrial agreement, agreed to not object to the government introducing evidence in sentencing that A1C W was substantially incapable of declining participation in the sexual contact when it occurred and to enter into a stipulation of expected testimony to that effect. The significance of this claim by A1C W was not, however, explained to the appellant relative to his potential guilt to a lesser included offense.

The appellant's guilty plea covered A1C L receiving anal intercourse from the appellant. According to the CDC, this had a transmission risk to A1C L of 1-in-200 (or 5-in-1,000). This is a higher risk than the 1-in-500 (or 2-in-1,000) risk in *Gutierrez* where our superior court found grievous bodily harm or death was not likely to occur when there was a 1-in-500 chance of the event occurring. Because the parties at trial here were only focused on whether the risk was "more than merely a fanciful, speculative, or remote possibility," the appellant did not agree this 1-in-200 figure meant it was "likely" HIV would be transmitted to A1C L. *See Joseph*, 37 M.J. at 396–97. Instead, the appellant stated in the guilty plea inquiry that this figure translated into "a chance" A1C L would become infected and "there was, percentage-wise, not a high possibility" of transmission. Furthermore, one of the appellant's primary arguments, prior to entering into the pretrial agreement, was that it was unlikely HIV would be transmitted to A1C L, given the sexual acts they engaged in and the appellant's low viral load. Under these circumstances, we also cannot find his plea to aggravated assault to be provident relative to the anal intercourse portion. *See Gutierrez*, 74 M.J. at 66 (holding a risk of "almost zero" or a risk that is only "remotely possible" is not sufficient to sustain an aggravated assault conviction).

The appellant's providence inquiry also covered the mutual oral sodomy between the two men. The appellant said he knew the transmission risk for oral sodomy was less than the 1-in-200 number for anal intercourse. He also agreed that the definitions and explanations from the 17 July conduct applied equally to this incident, which would include the consent discussion. As noted above, the CDC information indicated this conduct presented a "low" risk of transmitting HIV to the Airman, such transmission is rare, and accurate estimates of risk are not available. In light of this, we do not find his plea provident as to the oral sodomy portion of the aggravated assault specification.

In considering whether we can affirm a conviction for the lesser included offense of assault consummated by a battery, we must again consider the issue of consent. As discussed above, the military judge properly instructed the appellant that A1C L could not consent to an act of aggravated assault. The record then becomes unclear about the consent issue because the parties were not considering the "informed consent" concept our superior court later found critical in *Gutierrez*. 74 M.J. at 68. The appellant agreed with the military judge that "factually, [A1C L] was consenting and going along with all of this" and "although there might have been a factual consent here, it is not a legal defense in this case." The military judge did not discuss the concept of "meaningful informed consent" relative to A1C L's knowledge of the appellant's HIV status. Also, the record is not clear about when A1C L learned of the appellant's HIV status. In his providence inquiry on the aggravated assault specification, the appellant said he did not inform A1C L about his HIV status before the two engaged in sexual activity on 17 July 2012. Earlier, in the inquiry regarding the order violation, however, he says A1C L "told me that I had told him [about being HIV positive] when I was drunk the night before" but he then agreed he had not told A1C L about his status.

Under these circumstances, we cannot uphold a conviction for the lesser included offense of assault consummated by a battery because the relevant facts of this sexual encounter and the issue of consent as a defense to that offense was not adequately explored with the appellant during the plea inquiry. *See Outhier*, 45 M.J. at 328. Therefore, the finding of guilty for Specification 1 of Charge IV is set aside.

*3. Conduct on 18 and 21 July 2012*

The day after the sexual contact described above, the appellant engaged in further sexual activity with A1C L. By this point, A1C L was aware of the appellant's HIV status. The appellant told A1C L that, if he anally penetrated the appellant, the risk of transmission was "something like 1 in 500." A1C L then engaged in that conduct with the appellant. Several days later, on 21 July 2012, the two again engaged in that conduct, as well as mutual oral sodomy. The appellant pled guilty to violating the "protection" part of safe sex order during these encounters and aggravated assault with a means likely to produce death or grievous bodily harm.

For the reasons discussed above, the guilty plea to aggravated assault does not survive *Gutierrez*. 74 M.J. 61. The oral sodomy between the two men presented a "low" risk of transmitting HIV to A1C L, and the CDC information stated that accurate estimates of risk are not available and such transmissions are rare. There is therefore a substantial basis in law for questioning the oral sodomy aspect of his plea to the aggravated assault specification. Also, according to the CDC, the risk of transmission to A1C L from anally penetrating the appellant was 6.5 in 10,000, a number lower than the 1 in 500 (20 in 10,000) found insufficient in *Gutierrez*. This clearly demonstrates a substantial basis in law for questioning his plea.

In light of this, we do not find his plea provident as to the oral sodomy or anal intercourse portions of the aggravated assault specification. We also cannot affirm a finding of guilty for the lesser included offense of assault consummated by a battery because A1C L had the "meaningful informed consent" required by *Gutierrez* before he engaged in this sexual contact with the appellant on 18 and 21 July 2012. Therefore, the finding of guilty for Specification 2 of Charge IV is set aside.

*Prosecutorial Misconduct and Unlawful Command Influence*

During pretrial proceedings, the accused asked a military doctor on base to order his blood drawn and sent to a researcher at a state university medical school for analysis. In his request, the appellant noted "uncertainty" about whether he was HIV positive. Failing to see a medical purpose behind the request, the doctor refused to do so as the Air Force medical community was satisfied with the accuracy of the appellant's diagnosis. The defense then filed a motion, asking the military judge to order military personnel to

draw the blood so the defense could have it tested at the state university medical school laboratory where a researcher would use an electron microscope to look for the presence of the HIV virus in the appellant's blood.

The government opposed the motion[5] and attached an affidavit from the director of the military's HIV research program at Walter Reed Army Institute of Research who had significant expertise in diagnosing HIV. Based on her prior experience with the organization that was assisting the appellant on a pro-bono basis, the HIV program director believed the defense wanted to conduct electron micrograph (EM) studies of the appellant's blood plasma and present findings that the appellant was not infected with HIV. In her view, and as laid out in her affidavit, EM studies are research techniques and are not an accepted scientific or medically valid approach to evaluate HIV infection and it would be inappropriate for military or Tricare medical providers to be involved in drawing blood and sending it to an entity for this purpose.[6] In her affidavit, the HIV program director also stated the state university medical school facility did not meet the federal regulatory standards applied to clinical laboratories that perform testing on human samples for disease diagnosis or assessment. The HIV program director also expressed these views to the senior trial counsel (STC) assigned as the lead prosecutor in the case during several conversations. She also explained that she thought the state university could face repercussions for conducting the testing.

On 18 April 2013, a Rule for Courts-Martial (R.C.M.) 802 scheduling session was held and the blood draw motion was scheduled to be heard at an Article 39(a), UCMJ, session on 3 May. Meanwhile, the STC conducted additional research on the EM process and determined the state university researcher could not legally perform the testing the defense had requested. He believed the defense's plan to use the EM to challenge the appellant's HIV diagnosis would, in essence, be a diagnosis based on the plasma sample, without the university following the appropriate requirements for such a process.

Therefore, on 22 April 2013, the STC sent an email to the chair of the cell and developmental biology department at the university medical school, entitled "Misuse of Core Electron Microscopy Facility," after unsuccessfully trying to reach her by phone. He identified himself as a senior prosecutor for the Air Force who had recently learned the university's EM facility may have previously been employed to accomplish HIV testing of human blood sample for treatment or diagnostic purposes on behalf of an organization dedicated to challenging the adequacy of HIV testing and denying the link between HIV and AIDS. He further stated that part of the government's opposition to the blood draw motion was because "the testing of human blood samples for HIV diagnosis and treatment purposes at your facility is unlawful" and such testing is subject to "legal constraints." Because he wanted his email to be taken seriously, the STC referenced the

---

[5] After filing its initial opposition, the government amended its position by agreeing to perform the blood draw as long as the blood was subjected to Federal Drug Administration-approved testing at a properly certified laboratory.

[6] According to the HIV program director, the scientifically-accepted method to diagnose HIV is the Western Blot.

school chancellor and other senior staff in his email. He also provided her the name of the EM researcher who was named in the defense's request and noted that this individual may or may not have been previously involved in similar testing. At the time he sent this email, the STC knew this individual would likely be testifying for the defense on the upcoming blood draw motion litigation.

The chair of the cell and developmental biology department responded to the email by calling the STC the same day. Because she did not know the answer to his query, she forwarded his email to the co-directors of the EM facility and asked them to look into the issue.

The next day, the trial defense counsel learned about the email and contacted the STC to express concern about the chilling effect it could have and that the defense may seek relief from the court based on this email. The defense asked for a copy of the email but, realizing this issue may become the subject of future litigation, the STC declined to provide it until he could contact his leadership. The STC told the trial defense counsel that the military HIV program director has asserted in her affidavit that the defense proposal was unlawful and this contact with the university was part of his investigation into that issue. The STC provided the trial defense counsel with the email string later in the day.

Shortly after the STC talked to the trial defense counsel, an attorney and associate vice chancellor for the medical school contacted the STC to discuss the email. The attorney was concerned and began the conversation with words to the effect of, "What's this about [us having] done some illegal testing of some Air Force guy's blood?" The STC said he was actually trying to determine whether the Air Force could draw the blood as requested by the defense. The university attorney asked if the trial defense counsel could be involved in the discussion. Because those counsel had already expressed a concern with his actions, the STC provided their email addresses to the attorney and copied them on an email where he asked the attorney to get answers to three questions: (1) is the laboratory certified in a manner that allows it to accept human samples for diagnostic testing?; (2) if so, can the laboratory use the EM testing method to aid in the diagnosis of an HIV infection?; and (3) if not, can the laboratory use that method for that purpose?

At that point, the EM researcher who was going to do the testing for the defense had been shown the email by one of the EM facility directors and been directed not to accept any samples related to this case. He described the situation as a "sh*t storm" that had resulted in him being "all lawyered up" and unable to discuss the matter. He felt the prosecution was acting unfairly and had sullied his reputation as a faculty member with university leadership, an issue of paramount importance to him as an untenured professor. The researcher contended there was nothing unlawful about the work he had intended to do or had previously done as his role was simply to use the electron microscope to

determine if the HIV virus could be detected in the blood at the current viral load. This conclusion was validated after the medical school looked into the situation. However, the researcher refused to assist the defense in this case and also ended his work with the pro-bono organization due to his belief it would be "career suicide" and detrimental to his career at the university.

Based on this situation, the defense filed a motion to dismiss the charges with prejudice based on unlawful command influence and prosecutorial misconduct. The military judge found no actual unlawful command influence or prosecutorial misconduct. He did, however, find the appearance of unlawful command influence and ordered certain remedial measures, as described below. On appeal, the appellant contends these remedies were inadequate and also that actual unlawful command influence and prosecutorial misconduct occurred. The government argues the appellant waived these issues. We conclude the issue was not waived and the remedial measures were adequate.

*1. Waiver of Unlawful Command Influence and Prosecutorial Misconduct*

After the military judge ruled on the unlawful command influence and prosecutorial misconduct motion, the appellant entered into a pretrial agreement that included an agreement that he would "waive all waivable motions." The appellant pled guilty to most of the offenses, as described above and in accordance with his pretrial agreement.

When discussing the "waive all waivable motions" provision of the pretrial agreement, the military judge[7] told the appellant his unlawful command influence motion may not be waived by the guilty plea. The trial defense counsel indicated his belief that the prosecutorial misconduct aspect of the motion would also not be waived due to its impact on the appellant's right to due process. In response, the military judge advised the appellant that the appellate court would determine whether these issues are waived. Upon learning the government initiated this provision of the pretrial agreement, the military judge also told the parties that, based on case law, he considered unacceptable any attempt by the government to cause the appellant to waive unlawful command influence motions. The trial counsel and trial defense counsel agreed with this principle.

Despite this, the government now argues that the appellant has waived appellate review of the unlawful command influence issue and its brief does not acknowledge any of the above discussion between the appellant and the military judge.[8] We disagree.

---

[7] The military judge who presided over the original Article 39(a), UCMJ, sessions was replaced at this proceeding by a second military judge.

[8] Because the government relies entirely on waiver, its brief did not discuss the substantive issue of unlawful command influence.

When an appellant has intentionally relinquished or abandoned a known right at trial, "it is extinguished and may not be raised on appeal." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (citing *United States v. Harcrow*, 66 M.J. 154, 156 (C.A.A.F. 2008)). As this court pointed out in several recent decisions, our superior court to date has not applied waiver to issues of unlawful command influence arising during the adjudicative process, as it has for those arising during the accusatorial process. *See United States v. Dundon*, ACM 38436, unpub. op. at 5 n.5, 5–6 (A.F. Ct. Crim. App. 27 February 2015), *review denied*, __ M.J. __, No. 15-0511/AF (Daily Journal 2 June 2015)[9]; *United States v. Hutchinson*, ACM 38503, unpub. op. at 8–9 (A.F. Ct. Crim. App. 29 June 2015).

As we did in those cases, we decline to find waiver here. Given our superior court's precedent, we find the appellant could not waive the issue of unlawful command influence relative to the prosecutor's actions in this case. This result is especially appropriate based on the discussion between the military judge and the parties on this issue. Because of the interrelationship between the allegations of unlawful command influence and prosecutorial misconduct in this case, we also find the prosecutorial misconduct aspect of the appellant's motion was not waived.

*2. Unlawful Command Influence*

"No person subject to [the UCMJ] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof . . . ." Article 37, UCMJ, 10 U.S.C. § 837. Unlawful command influence is "'the mortal enemy of military justice.'" *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004) (quoting *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986)).

"Allegations of unlawful command influence are reviewed de novo." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citing *United States v. Harvey*, 64 M.J. 13, 19 (C.A.A.F. 2006)). When an "issue of unlawful command influence is litigated on the record, the military judge's findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that [we] review[] de novo." *United States v. Reed*, 65 M.J. 487, 488 (C.A.A.F. 2008). Once actual or apparent command influence is properly placed at issue, "no reviewing court may properly affirm findings and sentence unless it is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." *Thomas*, 22 M.J. at 394.

---

[9] In *Dundon*, we declined to find waiver and noted that this issue would be particularly appropriate for certification by the Judge Advocate General under Article 67(a)(2), UCMJ, 10 U.S.C. § 867(a)(2), in view of (1) the potential inconsistency between the courts of criminal appeals' precedents on waiver and adjudicative unlawful command influence and (2) the importance of clear guidance to military courts and the service members who appear before them. *United States v. Dundon*, ACM 38436, unpub. op at 2 n.1 (A.F. Ct. Crim. App. 27 February 2015). The Judge Advocate General did not certify the waiver issue to our superior court in that case.

The defense has the initial burden of raising the issue of unlawful command influence by presenting "some evidence" of unlawful command influence, meaning the defense must "show facts which, if true, constitute unlawful command influence." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999); *Salyer*, 72 M.J. at 423. This "burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Salyer*, 72 M.J. at 423 (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002). If raised on appeal, he must also show (1) the proceedings were unfair; and (2) the unlawful command influence was the cause of that unfairness. *Salyer*, 72 M.J. at 423; *Biagase*, 50 M.J. at 150. The burden then shifts to the government, who must prove beyond a reasonable doubt: (1) the predicate facts do not exist, (2) the facts do not constitute unlawful command influence, or (3) the unlawful command influence did not affect the findings and sentence. *Biagase*, 50 M.J. at 151.

We review not only for actual unlawful command influence but also for the appearance of unlawful command influence. *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006). "Even if there was no actual unlawful command influence, there may be a question whether the influence of command placed an 'intolerable strain on public perception of the military justice system.'" *Id.* (quoting *Stoneman*, 57 M.J. at 42–43). The mere appearance of unlawful command influence may be "as devastating to the military justice system as the actual manipulation of any given trial." *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991). This is an issue that is evaluated objectively with the focus on the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public. *Lewis*, 63 M.J. at 415. An appearance of unlawful command influence will exist "where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.*

Where, as here, the issue is litigated on the record at trial, the military judge's findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that this court reviews de novo. *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999).

The parties generally do not dispute the underlying facts found by the military judge. Based on his factual conclusions, the military judge first rejected the government's claim that a military prosecutor cannot commit unlawful command influence against civilian defense witnesses. *See United States v. Douglas*, 68 M.J. 349 (C.A.A.F. 2010) (analyzing unlawful command influence issues relating to civilian employees of the Air Force).

The military judge then found the defense had met its initial burden of raising "some evidence" of unlawful command influence. He based this conclusion on the subject line of the email ("Misuse of Core Electron Microscopy Facility"), the email's

reference to senior staff at the university (including the chancellor) and the prosecutor's comment that it was his understanding that the laboratory cannot lawfully accomplish the requested testing. The military judge concluded the government could not disprove these predicate facts, finding the email is "subject to interpretation and different individuals will react to it in different manners based on their perspective and positions" and also found it was undisputed that the researcher was no longer willing to assist the defense.

The military judge concluded the government had met its burden of demonstrating beyond a reasonable doubt that these facts did not constitute actual unlawful command influence. He held the email must be considered within the context of the caveats contained within it, as well as the phone calls and email that followed it and tempered the "aggressive" language in the initial email. The military judge found the STC had a duty to investigate the propriety of the methods described in the defense's request for a blood draw and concluded he was not attempting to influence the court-martial when he made the "poor word choices" in his initial email. The military judge noted that it may have been preferable for the STC to first raise these issues with the trial defense counsel or the military judge but concluded the STC was trying to be diligent in ensuring the government and court did not become entangled with a blood draw that may run afoul of regulatory requirements. The military judge noted that he had not yet ruled on the defense motion for a blood draw and the defense could still present the researcher's prior work as part of its effort to have his work found admissible under Mil. R. Evid. 702, even it if had lost the ability to present information through his live testimony.

The military judge, however, found there was some evidence of the appearance of unlawful command influence and elected to order certain corrective measures to ensure that any unlawful command influence would not affect the proceeding and to dispel even the appearance of such improper influence. Specifically, he directed the government to:

1. Locate and fund an EM expert with experience in analyzing viruses who could review the work done by the researcher in prior cases and advise the defense. This consultant need not be willing to perform an EM analysis of the appellant's blood. Instead, this expert would assist the defense in preparing for any Mil. E. Evid. 702 hearing into the legitimacy of the EM technique, to explain what EM can and cannot show, and to discuss the researcher's past efforts.

2. Stipulate to the testimony of the researcher for purposes of any Mil. R. Evid. 702 hearing, using the researcher's previously-submitted affidavit.

3. Allow the appellant to leave base in order to have his blood drawn by an entity within one day's drive.[10]

---

[10] The military judge also ordered the parties to brief whether the senior trial counsel (STC) should be disqualified from further participation in the court-martial pursuant to Rule for Courts-Martial 901(d)(3). He ultimately found that disqualification was not a necessary remedy to avoid the appearance of unlawful command influence in the case

The military judge also directed that the court-martial would not proceed to trial on the merits before 1 August 2013, an extension which would allow the pro-bono organization to find a replacement EM expert to supplement the government-provided EM expert he had ordered for the defense.

In this ruling, the military judge also concluded the STC had not engaged in prosecutorial misconduct, finding the initial email when taken in context and within the totality of the circumstances did not violate a legal norm or standard. *See United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (defining prosecutorial misconduct as an "action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon"). He found the STC did not obstruct the defense's access to evidence or improperly discourage or obstruct communication between the defense and the researcher. *See* Air Force Rules of Professional Conduct, Rule 3.4(a) (stating a lawyer shall not unlawfully obstruct another party's access to evidence); Air Force Standards for Criminal Justice, Standard 3-3.1(d) (stating a prosecutor shall not improperly discourage or obstruct communication between prospective witnesses and defense counsel). In reaching this conclusion, the military judge found the researcher's decision to cease his involvement on the appellant's case was "personal to [him] and his academic career and reputation" and his reaction was not something the STC could have anticipated.

Now that the appellant has raised the unlawful command influence issue on appeal, he has the burden of showing (1) facts which, if true, constitute unlawful command influence; (2) his trial proceedings were unfair; and (3) the unlawful command influence was the cause of that unfairness. *Salyer*, 72 M.J. at 423; *Biagase*, 50 M.J. at 150. He contends the STC's email alleging unlawful conduct constituted actual and apparent unlawful command influence and the military judge's remedial measures were inadequate because the researcher did not return to the defense team. We disagree.

As an appellate court, we evaluate the unlawful command influence issues by looking backwards at what occurred before the military judge's ruling *and* what happened in the case since that ruling. *See Biagase*, 50 M.J. at 151 (stating that if raised on appeal, an appellant must show, inter alia, that the trial proceedings were unfair and the unlawful command influence was the cause of that unfairness). The appellant has not met that burden here.

---

as the other remedial measures were adequate in that regard. He also found the trial counsel had not acted in any manner which may tend to disqualify him. The appellant does not contest this conclusion on appeal and—for unknown reasons—the STC did not participate on the record in any further proceedings.

The military judge directed the remedial measures and postponed the trial for over two months in order to allow the parties to implement those measures.[11] The trial, however, did not resume until five months after he issued his order. At that next court session, the appellant pled guilty as described above. There is no indication in the record of trial that the remedial measures were not complied with or that they were ineffective in remedying any actual unlawful command influence exerted by the STC's conduct. The appellant does not allege that the loss of the researcher from his defense team led him to plead guilty where he otherwise would not have. The fact that the researcher did not return to the defense team during this interim period is not sufficient evidence that the appellant's trial proceedings were unfair.

We find the appellant's silence after this remedy was ordered instructive to our conclusion that the military judge acted within his discretion in crafting a remedy aimed at ameliorating the effects of the STC's conduct. *See Douglas*, 68 M.J. at 355. Similarly, even if an objective, disinterested observer would have harbored a significant doubt about the fairness of the appellant's trial proceedings before the military judge ordered remedial measures, that observer, knowing of the military judge's remedies and the appellant's subsequent lack of complaint would no longer harbor such a doubt. In sum, we are convinced beyond a reasonable doubt that the trial counsel's conduct here did not affect the findings and sentence in the appellant's case and the disinterested public would now believe the appellant received a fair trial free from the effects of any unlawful command influence. *Lewis*, 63 M.J. at 415.

We also find the military judge did not abuse his discretion in denying the defense request to dismiss the charges based on prosecutorial misconduct. Even when such misconduct occurs, dismissal of the charges is not mandated. *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014). Instead, we consider whether prejudice resulted from any such misconduct. *United States v. Meek*, 44 M.J. 1, 6 (C.A.A.F. 1996). Evaluating prejudice requires the balancing of three factors: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005). Here, some of the language used by the STC in his initial email was aggressive, and, in our view, unnecessarily so, and was likely to provoke the exact reaction that occurred

---

[11] Contemporaneously with denying the defense's unlawful command influence motion, the military judge denied the defense motion to compel the government to draw the appellant's blood, finding the defense had failed to demonstrate its relevance and necessity. The military judge found no evidence the electron micrograph (EM) method is appropriate for medical purposes. Although EM may be used for research purposes, the state university medical school did not have a research protocol in place such that contract commercial laboratories could collect blood samples for use in that research. If such a protocol did exist, the appellant could have voluntarily participated in the study. Furthermore, the appellant had access to a military infectious disease specialist and a doctor associated with the pro-bono organization, either of whom could have assisted the appellant in procuring a blood draw, if those doctors thought it was medically or forensically necessary. The appellant did not move the military judge for reconsideration and, on appeal, has not alleged this ruling was erroneous or that it was negatively impacted by the absence of the EM researcher from the defense team.

here—the recipient contacted senior staff within her chain of command and the university's lawyer; and, the researcher referenced in the email felt it portrayed him in a negative and false light. However, for the reasons described above, we find the measures taken by the military judge to remedy the situation and the appellant's eventual decision to plead guilty demonstrates the ultimate lack of prejudice resulting from the email being sent.

*Sentence Reassessment*

This court has "broad discretion when reassessing sentences." *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013). Our superior court has repeatedly held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). This analysis is based on a totality of the circumstances with the following as illustrative factors: dramatic changes in the penalty landscape and exposure, the forum, whether the remaining offenses capture the gravamen of the criminal conduct, whether significant or aggravating circumstances remain admissible and relevant, and whether the remaining offenses are the type that we as appellate judges "have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Winckelmann*, 73 M.J. at 15–16.

Applying the *Winckelmann* factors, we are confident we can reassess the sentence. The sentencing authority was a military judge. As appellate military judges, we are familiar with the sentences generally imposed by military judges for the remaining Article 92, UCMJ, violations. The penalty landscape has significantly changed with the setting aside of the aggravated assault specifications. Prior to our dismissal of these specifications, the maximum sentence based on the appellant's guilty plea included a dishonorable discharge, confinement for 10 years and 6 months, reduction to E-1, and forfeitures of all pay and allowances.[12] After our dismissal, the remaining specifications carry a maximum sentence of a bad-conduct discharge, confinement for 18 months, reduction to E-1, and forfeitures of all pay and allowances.

However, the evidence showing how the appellant violated the safe sex orders (by having unprotected sexual contact with the two Airmen as described above) would have remained admissible and properly considered in aggravation. Finally, we note that the military judge was aware of the extraordinarily small likelihood that the appellant's conduct would actually have transmitted the virus and that none of his partners were infected as a result of the appellant's conduct. We are confident that, absent the

---

[12] The appellant was erroneously advised that the maximum confinement was 10 years and 9 months. We find no prejudice to the appellant from this error. *United States v. Mincey*, 42 M.J. 376, 378 (C.A.A.F. 1995) (holding there is no substantial misunderstanding of maximum punishment where the accused's misapprehension of the maximum was insubstantial in the appellant's decision to plead guilty).

aggravated assault specifications, the adjudged sentence would have been no less than a bad-conduct discharge and confinement for 8 months.

*Conclusion*

The findings of guilty of Specifications 1, 2, and 4 of Charge IV and Charge IV are set aside, and the charge and those specifications are dismissed. The remaining findings are affirmed. We affirm only so much of the sentence as provides for a bad-conduct discharge and confinement for 8 months. The remaining findings and the sentence, as reassessed and modified, are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant remains.[13] Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings, as modified, and the sentence, as reassessed, are

AFFIRMED.

FOR THE COURT

LAQUITTA J. SMITH
Appellate Paralegal Specialist

---

[13] We note the court-martial order states that multiple specifications (Specifications 1, 3, and 5 of Charge I, both specifications of Charge II, the specification of Charge III, and Specification 3 of Charge IV) were "withdrawn after arraignment." This was done in accordance with the pretrial agreement (see footnote 2 for explanation about Specification 3 of Charge I). However, that agreement stated the convening authority would "withdraw and dismiss [them] with prejudice." We order the court-martial order corrected to reflect this language from the pretrial agreement (we also note that the court-martial order has multiple typographical errors).