# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM S32773

————————————

### UNITED STATES
*Appellee*

**v.**

### John I. SANGER
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 7 August 2025

————————————

*Military Judge*: Adam D. Bentz.

*Sentence*: Sentence adjudged on 18 October 2023 by SpCM convened at Fairchild Air Force Base, Washington. Sentence entered by military judge on 6 November 2023: Bad-conduct discharge and reduction in grade to E-1.

*For Appellant*: Captain Michael. J. Bruzik, USAF.

*For Appellee*: Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Vanessa Bairos, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, DOUGLAS, and PERCLE, *Appellate Military Judges*.

Judge PERCLE delivered the opinion of the court, in which Senior Judge ANNEXSTAD joined. Senior Judge DOUGLAS filed a dissenting opinion.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

PERCLE, Judge:

A special court-martial composed of a military judge found Appellant guilty, in accordance with his pleas and pursuant to a plea agreement, of one specification of willful dereliction of duty, on divers occasions, in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892.[1] The military judge sentenced Appellant to a bad-conduct discharge and a reduction to the grade of E-1. The convening authority took no action on the findings or sentence.

Appellant raises three issues on appeal: (1) whether Appellant's convictions should be set aside and dismissed with prejudice because the regulation that he was prosecuted for violating, Air Force Instruction (AFI) 51-508,[2] ¶ 3.4, was facially unconstitutional under the First Amendment;[3] (2) whether Appellant's convictions should be set aside and dismissed with prejudice because Article 92, UCMJ, was unconstitutional as applied because the specification charged by the Government only alleged constitutionally protected speech; and (3) whether the entry of judgment erroneously directed Appellant to be subject to criminal history indexing for a non-qualifying offense under Air For Manual (AFMAN) 72-102. On 29 May 2025, we specified the following issue: (4) whether Appellant's plea of guilty was provident.

As to the specified issue, we find Appellant's plea to the Charge and Specification was improvident as there is a substantial basis in law to question Appellant's guilty plea. Accordingly, we set aside the finding of guilty and sentence and remand to The Judge Advocate General for further proceedings consistent with this opinion. We do not address the remaining issues.

# I. BACKGROUND

Appellant was charged with one specification in violation of Article 92, UCMJ, alleging Appellant had a duty to refrain from "actively advocating supremacist and extremist ideology and causes," and that on divers occasions Appellant was knowingly derelict in the performance of this duty.

Prior to trial, through defense counsel, Appellant entered into a plea agreement with the convening authority. Appellant agreed to plead guilty to the

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Although Appellant's brief cites Air Force Instruction 51-503, Appellant's stipulation of fact, as well as Appellate Exhibit III, correctly cite Air Force Instruction 51-508, *Political Activities, Free Speech and Freedom of Assembly of Air Force Personnel* (12 Oct. 2018).

[3] U. S. CONST. amend. I.

Charge and its Specification at a special court-martial, elect trial by military judge alone, waive all motions which may be waived under the Rules for Courts-Martial, agree to a reasonable stipulation of fact sufficient to establish each of the elements of the offense, and waive his right to have any witnesses travel at government expense. In exchange, the Government and Appellant agreed the military judge must, upon acceptance of the guilty plea, enter a sentence with a maximum confinement length of zero days, and must adjudge a bad-conduct discharge. There were no other sentence limitations in the plea agreement.

The stipulation of fact consisted of six pages, including 21 relevant paragraphs.[4]

## A. Evidence of Duty to Obey

### 1. Stipulation of Fact

In the stipulation of fact, Appellant agreed Air Force Instruction (AFI) 51-508, *Political Activities, Free Speech and Freedom of Assembly of Air Force Personnel*, dated 12 October 2018, was a lawful general regulation and that he had a duty to obey it.

### 2. *Care*[5] Inquiry

The following excerpts from Appellant's guilty plea relate to the establishment of Appellant's duty:

> [Military Judge (MJ):] [Appellant], did you have a duty to refrain from actively advocating supremacist and extremist ideology and causes?
>
> [Appellant:] Yes, Your Honor.
>
> [MJ:] And how was that duty imposed?

---

[4] Appellant was charged with divers willful dereliction of duty "at or near Spokane, Washington." Nine of the paragraphs in the stipulation of fact, paragraphs seven through fifteen, address misconduct Appellant is alleged to have committed "at or near" Al Dhafra Air Base, United Arab Emirates. At trial, the military judge found this conduct was "not near Spokane, Washington" and did not fall "within the charge and specification." The military judge did "[consider] it as it provided context to the evolution of [Appellant's] behavior, but [he] did not consider that as matters that fell within the charge, and [he] did not craft a sentence specific to that misconduct." For the purposes of our Article 66, UCMJ, 10 U.S.C. § 866, review and opinion, we decline to consider the contents of these paragraphs alleged to have been committed while Appellant was in the United Arab Emirates. Even if we did consider it for any permitted limited purpose, our conclusion would not differ.

[5] *United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969).

. . . .

[Appellant:] Your Honor, I knew there were rules for what we are allowed to talk about as an Airman and as a representative of the Air Force. I was not aware of the specific instruction at the time, but now I am – I've been made aware.

. . . .

[MJ:] So I believe – and, again, correct me if I'm wrong – when you are referencing an instruction or a regulation, you're talking about – in your Stip[ulation] of Fact, it talks about Air Force Instruction 51-508. Is that the regulation you are referencing?

[Appellant:] Yes, Your Honor.

## B. Evidence of Appellant's Knowledge of the Duty

### 1. Stipulation of Fact

The stipulation of fact does not address the element of Appellant's knowledge of the duty outside the following restatement of the charged specification, reading "on divers occasions, at or near Spokane, Washington, Appellant, *who knew of his duties*, was derelict in the performance of those duties in that he willfully failed to refrain from actively advocating supremacist and extremist ideology and causes, as it was his duty to do." (Emphasis added).

### 2. *Care* inquiry

The following excerpts from Appellant's guilty plea relate to the establishment of Appellant's knowledge of the duty:

[MJ:] And you said that you didn't know that that [regulation] existed, but you still knew that there were rules that you couldn't do what you did. Is that right?

[Appellant:] Yes, Your Honor.

[MJ:] Could you talk to me a little bit more about that, as to what you knew?

[Appellant:] I understood that most likely if my behaviors and stances [sic] came to light, that there would be some kind of consequences. What those were, I didn't know.

[MJ:] . . . I would like you to focus, if you can, on, specifically, what duties you had as an Airman that you knew about, not to do these things.

[Appellant:] Your Honor, I was aware of proper workplace behavior and discussions and topics. That was something that I

was counseled on that I was made aware of at the time, and I did not realize that my anonymous statements online were in violation of any regulation. Does that answer your question, Your Honor?

[MJ:] Partially. I appreciate that. When you say you didn't realize what you were posting online was violating any regulation, are you telling me that you didn't know that there was a specific regulation that was violated, but you still knew you had a duty not to, or are you telling me that you didn't think you were doing anything wrong at that point? Does that distinction make sense?

[Appellant:]: Yes, it does make sense. I understood I was doing something wrong, but I didn't know, specifically, what it pertained to.

[MJ:] And did you know, specifically, that although you couldn't cite me the regulation at that point, that you still had a duty as an Airman at that point not to be making those comments?

[Appellant:]: Yes, Your Honor.

The military judge read aloud paragraphs 3.4, 3.4.1, 3.4.2.3, and 3.4.2.4[6] of AFI 51-508 and then asked Appellant more questions about his understanding of his duty.

[MJ:] . . . do you feel that what you did between this time period violates those definitions as I read them to you?

[Appellant:] Yes, Your Honor.

[MJ:] And even though you weren't aware of [AFI] 51-508 at the time, do you agree that you were aware that you were not allowed to actively advocate in supremacist and extremist ideology?

[Appellant:] Yes. Yes, Your Honor.

In the presentencing proceeding, during Appellant's unsworn statement, Appellant discussed the role of the commander to curb potential misconduct as specified in AFI 51-508. Appellant indicated that if he had been informed about the potential consequences of his conduct he may have stopped committing the crime sooner.

[Civilian Defense Counsel (CDC)]: And that instruction says that "Commanders should intervene early, primarily through

---

[6] The content of these paragraphs is listed in section II.A.3 *infra.*

counseling, when observing such signs, even though the signs may not rise to active advocacy or active participation, or may not threaten good order and discipline but only suggest such potential." Did your command, when it became known to them that you were involved in some of this supremacist and racist activity online and with others, did your command ever counsel you about your involvement with some of these posts and reposts?

[Appellant]: No, sir, they did not.

[CDC]: The instruction also -- paragraph 3.4.4 also encourages use of administrative power, such as non-punitive counseling and performance evaluations to deter such activity, such as engaging in supremacist and racist activities. Did the command ever use their administrative powers to, perhaps, issue a Letter of Counseling, Admonition, or Reprimand?

[Appellant]: No, sir.

[CDC]: So when it became known you were posting and reposting some of things from the deployed environment, no one ever counseled you about the fact that that was not allowed under the Air Force instructions?

[Appellant]: No, sir, they did not.

[CDC]: What do you think you would have done if your commander would have pulled you in and said, "Hey, we're aware of some of these posts and reposts and that's in violation of AFI 51-508. Do this again, and we're gonna ratchet this up to, you know, [a Letter of Reprimand] or non-judicial punishment,["] how do you think you would have responded to that?

[Appellant]: I think it would have gotten my attention and taken me from that course and that path, in general, just seeing that "It's known and, so, now I need to refrain for sure."

For this reason, among others, after Appellant's unsworn statement the military judge reopened the guilty plea providence inquiry.

[MJ:] So I just wanted to clarify. Can you talk to me about your duty prior to you committing these offenses? Does that make sense? And, please, take time to talk to your defense counsel if you would like.

[Appellant:] Yes, Your Honor. What I meant by that – I think what I was trying to say was if I had been made aware that my

leadership was aware, I would have refrained from those activities much sooner. Does that answer your question, Your Honor?

[MJ:] I think so. So you knew, though, that you had a duty – again, I understand most people don't memorize AFIs, right, and you weren't well versed in what [AFI] 51-508 said. But you knew at the time that you were doing these things that you talk about in the Stipulation of Fact that you had a duty, as an Airman, not to actively advocate those causes?

[Appellant:] Yes, Your Honor.

[MJ:] And you were simply clarifying as [if] had people addressed it with you earlier, then, perhaps, even though you already knew, you would have stopped sooner?

[Appellant:] Yes, Your Honor.

. . . .

[MJ:] And, then, you later stated that when you were posting things online, you publicly never [identified] yourself or anything of that nature. I just want to make clear, again. You might remember earlier today we talked about that it has to be crystal clear when there is potential conflict between First Amendment constitutional protections and your duties as an Airman under Article 92[, UCMJ]. And in stating that, I just want to make clear were you suggesting in any way that you felt that because you didn't identify yourself, because you were simply just posting things on the internet, that that was constitutionally protected behavior that was not an offense under Article 92? Can you speak to me on that at all?

. . . .

[Appellant:] Your Honor, I understood that even though I was anonymous, I did not have a constitutional right due to the fact that I was in the Air Force and held to a higher standard of speech [inaudible].

## C. Evidence of Appellant's Willful Dereliction

### 1. Stipulation of Fact

Appellant participated in group text chat sessions and met with people associated with national white extremist groups.

During his regular meetings with persons associated with these groups, Appellant "shot firearms with some of them, discussed their shared ideology and plans, and advocated for their ideology and causes."

7

The stipulation outlines several postings Appellant made on certain accounts related to white national extremist ideology. However, for each of the postings the stipulation is unclear if Appellant posted these things as himself, under an alias, or anonymously. According to the stipulation of fact, when Appellant shared one symbol associated with Naziism, he was unaware what it meant and mistook the symbol for "mere art."[7]

These statements Appellant posted express sentiments like, "We aren't even allowed to criticize public officials anymore . . . . It is my sincerest hope that one day we will hunt them down;" a swastika and other pro-Nazi content; and a message in support of an individual who allegedly planned to detonate a bomb in Washington, D.C., and Appellant's desire that "hopefully he inspires others."

Appellant expressed a desire, online or in person, to target COVID-19 vaccination sites and those who enforced mask mandates with real "consequences." Appellant stated that he wanted to do more than just talk online. He wanted to "f[**]king kill people." He made racist statements and described black Americans as "an infestation." Appellant made antisemitic statements including "I don't hate every single Jew without reservation. I just hate what they've done to Western civilization, and I hate their nature, and I hate them as a whole."

In addition to reposting messages in online group texts and making certain supremacist and extremist statements aloud, Appellant introduced an acquaintance, whom Appellant was unaware was an undercover Air Force Office of Special Investigations (OSI) agent, to his group of white supremacist friends. Appellant witnessed others damage public property with white supremacist graffiti and stickers. Further, upon being interviewed by OSI, Appellant admitted he had placed a sticker in downtown Spokane, Washington, stating, "It's OK to be white." He explained he was concerned that the white race was dying out.

### 2. *Care* inquiry

During the plea inquiry,

> [MJ:] Talk to me, if you can, about the specification against you that says you actively advocated. Can you talk to me a little bit and explain how you actively advocated during this time period?

---

[7] During his plea inquiry, Appellant stated, "I knew that the symbol was used by that community -- the community that I was involved in online. I was not aware of the specifics and the implications."

[Appellant:] Your Honor, I had an anonymous account online that would repost posts from other extremist accounts advocating for causes, advocating for violence. I also, at one point, went out with other individuals to put stickers up in the form of activism. I also met with other people that had similar ideals, and we discussed how to further that agenda. I also tried to find other people to bring into those group chats at given points. Those are some of the examples of actively advocating that come to mind.

Appellant explained that he met with these like-minded individuals at or near Spokane, Washington, "seven or more times" and agreed "yes" to the military judge asking that "during those discussions, [Appellant felt he was] actively advocating with those people [he was] meeting with supremacist and extremist ideology and causes?"

**D. First Amendment Inquiry**

Turning to the issue of whether Appellant's alleged offense included protected speech and protected freedom of assembly pursuant to the First Amendment, the military judge asked Appellant his perspective.

[MJ:] So with that, I wanted to ask you[,] are you aware that you have certain rights under the First Amendment, namely freedom of speech and freedom of assembly?

[Appellant:] Yes, Your Honor.

[MJ:] And have you had an opportunity to discuss your First Amendment rights and any potential defense your First Amendment rights could give rise to in this case with your defense counsel?

[Appellant:] Yes, Your Honor.

[MJ:] Do you feel that your conduct – both that you've discussed with me and in the Stipulation of Fact – do you feel your conduct was constitutionally protected?

. . . .

[Appellant:] I understand there's a First Amendment, but I also understand there are more strict rules for service members, so no.

[MJ:] So do you feel that the First Amendment in any way provides you a defense to the words and the actions that you took?

[Appellant:] No, Your Honor.

9

During the plea agreement inquiry, the military judge asked Appellant's trial defense counsel what motions under the Rules for Courts-Martial they would have raised but for the provision in the plea agreement to waive all motions. The trial defense counsel responded that their waived motion to dismiss for failure to state an offense would have been "rooted in constitutional concerns."

The military judge also asked Appellant his perspective on the provision in the plea agreement agreeing to waive all motions that may be waived under the Rules for Court-Martial, including the First Amendment concern, and Appellant stated he understood the term and agreed to it in order to receive what he thought was a beneficial agreement.

**E. Appellant's Mental Health**

During his unsworn statement, Appellant discussed the traumatic loss of his first child he and his wife experienced while at his first duty assignment. Appellant explained that he was so distraught after the loss that he requested a transfer out of his original assigned career field to help alleviate his mental health concerns and also requested a permanent change of station away from the location of the trauma and loss. Appellant switched careers and locations, arriving next to the locus of the allegations, Spokane, Washington. Once Appellant arrived at his new duty location in Spokane, Appellant sought behavioral health treatment and tried to learn a new job to alleviate the mental strain he was experiencing. This move coincided with the approximate beginning of the charged timeframe. Appellant stated he struggled to get the help he needed in Spokane and then suffered the loss of an additional child while deployed. In Appellant's words, "So that kind of -- that also affected my mental state very negatively, and I didn't realize how bad it was until I looked back on myself. I thought I was -- I thought I was doing okay. And it's become abundantly clear that I most definitely was not okay."

Appellant also stated during his unsworn statement:

> [CDC:] During the providence inquiry with the judge, you talked about impulsive posting. Do you have anything to add about the impulsivity aspect of it?

> [Appellant:] Yes. With the status of my mental health just deteriorating, I realize that I became more impulsive, and my decision making was really inhibited. I was making poor decisions with very little evaluation or thinking prior to that. And, so, I made a lot of posts not really thinking much of it, not really remembering what I posted, and many times when I became aware of it and realized it, I would take those posts down. . . .

> . . . .

10

[Appellant:] When I saw the posts again, roughly a year later after coming out of the haze that I had been in, looking back on my choices and decisions that I made, I'm deeply ashamed of the things that I said, of the things that was espousing, of the people that I was criticizing, the groups, and just my complete lack of caring about the wellbeing of other people as it was indicated by those posts. I just didn't -- I wasn't being very thoughtful.

The remaining facts necessary to resolve the specified issue are included below.

## II. DISCUSSION

### A. Law

#### 1. Provident Pleas

We review a military judge's decision to accept a guilty plea for abuse of discretion. *United States v. Riley*, 72 M.J. 115, 119 (C.A.A.F. 2013) (citing *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008)). "An abuse of discretion occurs when there is 'something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea.'" *Id.* (quoting *Inabinette*, 66 M.J. at 322).

"The fundamental requirement of plea inquiry under *Care* and [Rule for Courts-Martial (R.C.M.)] 910 involves a dialogue in which the military judge poses questions about the nature of the offense and the accused provides answers that describe his personal understanding of the criminality of his or her conduct." *United States v. Hartman*, 69 M.J. 467, 469 (C.A.A.F. 2011). "The providence of a plea is based not only on the accused's understanding and recitation of the factual history of the crime, but also on an understanding of how the law relates to those facts." *United States v. Medina*, 66 M.J. 21, 26 (C.A.A.F. 2008) (citing *United States v. Care*, 18 C.M.A. 535, 538–39, 40 C.M.R. 247, 250–51 (1969)).

"The military judge must ensure there is a basis in law and fact to support the plea to the offense charged." *United States v. Soto*, 69 M.J. 304, 307 (C.A.A.F. 2011) (citing *Inabinette*, 66 M.J. at 321–22) (additional citation omitted). The military judge may consider both the stipulation of fact and the inquiry with the appellant when determining if the guilty plea is provident. *United States v. Hines*, 73 M.J. 119, 124 (C.A.A.F. 2014). "A plea is provident so long as [the a]ppellant was 'convinced of, and [was] able to describe, all of the facts necessary to establish [his] guilt.'" *United States v. Murphy*, 74 M.J. 302, 308 (C.A.A.F. 2015) (second and third alterations in original) (quoting *United States v. O'Connor*, 58 M.J. 450, 453 (C.A.A.F. 2003)).

"If an accused sets up matter inconsistent with the plea at any time during the proceeding, the military judge must either resolve the apparent inconsistency or reject the plea." *Hines*, 73 M.J. at 124 (internal quotation marks omitted); *see also* Article 45(a), UCMJ, 10 U.S.C. § 845. "This court must find 'a substantial conflict between the plea and the accused's statements or other evidence' in order to set aside a guilty plea. The 'mere possibility' of a conflict is not sufficient." *United States v. Watson*, 71 M.J. 54, 58 (C.A.A.F. 2012) (quoting *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996)).

In addressing Article 45(a), UCMJ, the United States Court of Appeals for the Armed Forces (CAAF) has stated,

> "If an accused 'sets up matter inconsistent with the plea' at any time during the proceeding, the military judge must either resolve the apparent inconsistency or reject the plea." (quoting *Garcia*, 44 M.J. at 498 (quoting Article 45(a), UCMJ)). Military judges often can "resolve" apparent inconsistencies by asking the accused questions and receiving answers that show no actual inconsistency exists. *See, e.g.*, [*Hines*, 73 M.J. at 124–25] (holding that the military judge's questioning clarified the amount of military allowances wrongfully taken despite an apparent inconsistency in the stipulation of fact); *United States v. Goodman*, 70 M.J. 396, 399–400 (C.A.A.F. 2011) (holding that the military judge's questioning clarified that the accused's suggestion of a possible defense was not inconsistent with his guilty plea because one of the elements of the defense could not be established).

*United States v. Saul*, __ M.J. __, No. 24-0098, 2025 CAAF LEXIS 578, at *7 (C.A.A.F 21 Jul. 2025) (holding that a military judge abused his discretion for accepting a guilty plea for willful destruction of property when the appellant made substantially conflicting statements as to his willfulness during a *Care* inquiry).

"[A] providence inquiry that includes conclusions of law alone" does not "satisf[y] the requirements of Article 45[, UCMJ, 10 U.S.C. § 845,] and R.C.M. 910." *United States v. Jordan* 57 M.J. 236, 239 (C.A.A.F. 2002). In *Jordan*, our superior court held that where the plea "colloquy between appellant and the military judge . . . reveals that appellant simply responded 'Yes, sir' to the several questions put to him as to whether his conduct was prejudicial to good order and discipline or service discrediting[,]" such questions "were legal conclusions with which appellant was asked to agree without any admissions from him to support them. As such, they were 'mere conclusions of law recited by an accused [that] are insufficient to provide a factual basis for a guilty plea.'" *Id.*

(third alteration in original) (quoting *United States v. Outhier*, 45 M.J. 326, 331 (C.A.A.F. 1996)).

When an accused makes inconsistent statements during his *Care* inquiry such that they may create a substantial inconsistency, resolution of the inconsistency at trial may require an accused to "retract" or "modify" prior inconsistent statements, or in some way explain away a misunderstanding related to prior statements. *See Saul*, 2025 CAAF LEXIS 578 at *11. One way to do this is for a military judge to ensure subsequent conversations and agreements by an accused related to inconsistences "supersede" prior statements an accused made that created the inconsistency in the first place. *Id.* at *12.

### 2. First Amendment

The First Amendment to the United States Constitution states, "Congress shall make no law . . . abridging the freedom of speech or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.

Though servicemembers are not excluded from all First Amendment protection,

> the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.

*Parker v. Levy*, 417 U.S. 733, 758 (1974).

"[M]ilitary authorities may curtail a servicemember's communication and association with other individuals -- and thus burden the servicemember's freedom of speech and association -- provided the authorities act with a valid military purpose and issue a clear, specific, narrowly drawn mandate." *United States v. Moore*, 58 M.J. 466, 468 (C.A.A.F. 2003) (first citing *United States v. Jeffers*, 57 M.J. 13, 15–16 (C.A.A.F. 2002); then citing *United States v. Padgett*, 48 M.J. 273, 276–78 (C.A.A.F. 1998); then citing *United States v. Nieves*, 44 M.J. 96, 98–99 (C.A.A.F. 1996); and then citing *United States v. Womack*, 29 M.J. 88, 90 (C.M.A. 1989)).

"When a charge against a servicemember may implicate both criminal and constitutionally protected conduct, the distinction between what is permitted and what is prohibited constitutes a matter of critical significance." *Hartman*, 69 M.J. at 468 (internal quotation marks and citation omitted). "With respect to the requisite inquiry into the providence of a guilty plea . . . the colloquy

between the military judge and an accused must contain an appropriate discussion and acknowledgment on the part of the accused of the critical distinction between permissible and prohibited behavior." *Id.* (citations omitted). "A discussion between the trial counsel and the military judge about legal theory and practice, at which the accused is a mere bystander, provides no substitute for the requisite interchange between the military judge and the accused." *Id.* at 469. "In the absence of a dialogue employing lay terminology to establish an understanding by the accused as to the relationship between the supplemental questions and the issue of criminality, we cannot view [an appellant's] plea as provident." *Id.*

A military judge can abuse his discretion by "failing to abide by the heightened plea inquiry requirements under [*Hartman*]." *United States v. Kim*, 83 M.J. 235, 238 n.1 (C.A.A.F. 2023). "[When] Appellant's behavior . . . occupies a constitutional gray area similar to that at issue in *Hartman*. . . . the plea colloquy should have established why possibly constitutionally protected material could still be service discrediting in the military context." *Id.* at 239 (citation omitted). "If we adhere to the heightened standard outlined in *Hartman*, the military judge should have discussed with Appellant the existence of constitutional rights relevant to his situation and made sure Appellant understood why his behavior under the circumstances did not merit such protection." *Id.*

### 3. Elements of the Offense

To be convicted of willful dereliction of duty as charged, the military judge was required to find Appellant's plea provident to the following elements: (1) that Appellant had certain duties, that is to refrain from actively advocating supremacist and extremist ideology and causes; (2) that Appellant knew of his duties; and (3) that on divers occasions, during the charged timeframe, at or near Spokane, Washington, Appellant was willfully derelict in the performance of those duties by failing to refrain from actively advocating supremacist and extremist ideology and causes. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 18.b.(3)(a)–(c).

"A duty may be imposed by treaty, statute, regulation, lawful order, standard operating procedure, or custom of the Service." *MCM* pt. IV, ¶ 18.c.(3)(a). "'Willfully' means intentionally." *MCM*, pt. IV, ¶ 18.c.(3)(c). It refers to the doing of an act knowingly and purposely, specifically intending the natural and probable consequences of the act. *Id.*

> Military personnel must not actively advocate supremacist, extremist, or criminal gang doctrine, ideology, or causes, including those that advance, encourage, or advocate illegal discrimination based on race, creed, color, sex, religion, ethnicity, or national origin or those that advance, encourage, or advocate the

use of force, violence, or criminal activity or otherwise advance efforts to deprive individuals of their civil rights.

AFI 51-508, *Political Activities, Free Speech and Freedom of Assembly of Air Force Personnel*, ¶ 3.4 (12 Oct. 2018).

> Military personnel must reject active participation in criminal gangs and in other organizations that . . . [a]dvocate supremacist, extremist, or criminal gain doctrine, ideology or causes; . . . [a]ttempt to create illegal discrimination based on race, creed, color, sex, religion, ethnicity, or national origin; [a]dvocate the use of force, violence, or criminal activity; or . . . [o]therwise engage in efforts to deprive individuals of their civil rights.

AFI 51-508, ¶ 3.4.1–3.4.1.4.

> A supremacist doctrine, ideology, or cause is characterized by, but is not limited to, having a fundamental tenet of its nature that particular members of one race, color, gender, national origin or ethnic group are genetically superior to others. Membership in such organizations is usually restricted to those belonging to that particular race, color, gender, national origin, or ethnic group.

AFI 51-508, ¶ 3.4.2.3.

> An extremist doctrine, ideology, or cause is characterized by, but is not limited to, a common belief which might otherwise be politically or socially acceptable, but that espouse the use or threat of force or violence to obtain their goals.

AFI 51-508, ¶ 3.4.2.4.

### 4. Mental Health in Plea Inquiries

In *United States v. Harris,* our superior court concluded:

> We do not see how an accused can make an informed plea without knowledge that he suffered a severe mental disease or defect at the time of the offense. Nor is it possible for a military judge to conduct the necessary *Care* inquiry into an accused's pleas without exploring the impact of any mental health issues on those pleas.

61 M.J. 391, 398 (C.A.A.F. 2005). On the other hand, in *United States v. Shaw*, the court concluded that the "[a]ppellant's reference to his diagnosis of bipolar disorder, without more, at most raised only the 'mere possibility' of a conflict with the plea." 64 M.J. 460, 464 (C.A.A.F. 2007). In reaching this conclusion, the court noted first "there was no factual

record developed during or after the trial substantiating [the a]ppellant's statement or indicating whether and how bipolar disorder may have influenced his plea." *Id.* at 462.

## B. Analysis

Appellant's conviction for willful dereliction of duty, violation of Article 92, UCMJ, was for willfully failing on divers occasions to refrain from actively advocating supremacist and extremist ideology. In response to the specified issue, Appellant argues, *inter alia*, that his plea is improvident because the *Care* inquiry, (1) "did not show that [Appellant] had knowledge of the duty he was alleged with violating;" and (2) "did not establish how the subject causes and ideologies were of an extremist or supremacist nature, a defect which could not be cured through the stipulation of fact." The Government argues in response to our order that Appellant's plea, coupled with the stipulation of fact, sufficiently established a provident plea.

To begin, nothing in this opinion should be read to suggest this court's approval of Appellant's underlying alleged conduct. Further, nothing in this opinion should be construed as this court opining on constitutionality of the underlying regulation addressed in this case. Whether the version of AFI 51-508 applicable to Appellant's conduct was constitutional as written or applied is not a question we reach.[8] Instead, we focused on the duty of a military judge to ensure during a plea inquiry that an accused understands and appreciates the critical distinction "between what is permitted and what is prohibited" as it relates to his or her constitutional rights. *Hartman*, 69 M.J. at 498. In this case, we find the military judge abused his discretion in accepting Appellant's plea to the Charge and Specification because the military judge failed to conduct an appropriately "heightened" plea inquiry related to Appellant's constitutional rights as is required by *Hartman*.[9]

### 1. "Heightened" *Hartman* Plea Inquiry

There is no question that Appellant's First Amendment rights of free speech and assembly are squarely at issue with the charged conduct of

---

[8] Our esteemed colleague in her dissent focuses on Appellant's waiver of this issue. We do not reach this question, as it is separate and apart from determining whether Appellant's plea was provident.

[9] Because we resolve the issue of providency on *Hartman*, we do not reach the issue raised by Appellant as to if the record establishes the subject causes were extremist or supremacist in nature.

willfully failing to refrain from advocating certain ideologies and be-
liefs. It is also true that "[m]ilitary authorities may curtail a service-
member's communication and association with other individuals -- and
thus burden the servicemember's freedom of speech and association --
provided the authorities act with a valid military purpose and issue a
clear, specific, narrowly drawn mandate." *Moore* 58 M.J. at 468.

Simply put, the military judge's reference to the First Amendment
during the *Care* inquiry, coupled only with a reliance on unknown ad-
vice from Appellant's trial defense counsel, is not sufficient to satisfy
*Hartman* any more than "a discussion between the trial counsel and the
military judge about legal theory and practice, at which the accused is
a mere bystander" is.[10] *Id*. While we commend the military judge for
recognizing the intersection of Appellant's conduct and the First
Amendment, a reference to the Constitution alone is not sufficient to
satisfy his duty to obtain a provident plea under these circumstances.
The military judge should have had dialogue with Appellant, on the rec-
ord, "employing lay terminology to establish an understanding by the
accused as to the relationship between" what conduct by the accused, if
any, was constitutionally protected and what was not and why. *Id*. Put
another way, the military judge should have established "the existence
of constitutional rights related to [Appellant's] situation and made sure
Appellant understood why his behavior under the circumstances did not
merit such protection." *Kim*, 83 M.J. at 239. No such discussion or dia-
logue using lay terminology occurred in this case between the military
judge and Appellant.

We acknowledge there is no one way or talismanic incantation suffi-
cient to accomplish this "heightened" *Hartman* inquiry, but we are con-
vinced it was not satisfied in this case. The brief exchange between the
military judge and Appellant did nothing to flesh out in "lay terminol-
ogy" Appellant's conduct and why, in his case, certain constitutional
protections did not apply. In light of factual cases like *United States v. Wil-
cox,* 66 M.J. 442 (C.A.A.F. 2008) *(*where the court found "no authority support-
ing criminal penalties for unpopular and distasteful views made in private be-
tween two individuals that fall short of proposing criminal activity"), we expect
a military judge to carefully parse through Appellant's alleged conduct, con-

---

[10] This is not to say trial defense counsel was deficient in his performance of his duties
with respect to the advice he gave Appellant, but rather emphasizes the burden is on
the military judge to have the appropriate colloquy with an accused on the record when
constitutional issues are at play.

ducted online, in person, anonymously and otherwise, to determine which conduct constituted a non-protected willful dereliction of Appellant's duty, a duty he knew and understood at the time of the offense. In the absence of such a dialogue, we find Appellant's plea improvident.

### 2. Additional Unresolved Substantial Conflicts

Were any reviewing authority to find the military judge's exchange with Appellant related to his constitutional rights sufficient to satisfy the "heightened" call of *Hartman*, we note additional concerns with Appellant's plea inquiry which contributed to our decision to set aside Appellant's plea as improvident.

Our review of the record establishes there is an unresolved substantial conflict as to Appellant's knowledge of his duties at the time he committed the offenses. This case is substantially similar to the recent case resolved by the CAAF in *Saul*. In that case, the appellant initially made statements during his *Care* inquiry that indicated his actions were not willful. *Saul*, 2025 CAAF LEXIS 578, at *3. In that case, although the military judge followed up with more questions to determine the requisite mens rea, appellant never retracted his prior statements about his willingness nor sufficiently stated his earlier understanding was mistaken. *Id.* at *5. The CAAF then found this plea improvident. *Id.* at *6. The same is true in this case.

As charged, the military judge had to determine whether Appellant's plea was provident for each of the following three elements: (1) that Appellant had a certain duty, that is to refrain from actively advocating supremacist and extremist ideology and causes; (2) that Appellant knew of this duty; and (3) that on divers occasions, during the charged timeframe, at or near Spokane, Washington, Appellant was willfully derelict in the performance of this duty by failing to refrain from actively advocating supremacist and extremist ideology and causes. Appellant repeatedly set up "matter[s] inconsistent with his plea" related to what he knew his duty was at the time of the charged misconduct. Although the military judge questioned and even reopened the *Care* inquiry to address these inconsistent matters, our review of the record concludes that the inconsistency remains. *See Hines*, 43 M.J. at 124.

From the beginning, Appellant explained to the military judge that he did not know about the verbiage of AFI 51-508 at the time of his misconduct. While it is not required Appellant know of the name of the AFI or exact wording to prove knowledge of a duty, it is required Appellant actually knew of his duty at the time he willfully failed to refrain from following it. It is also required, absent knowledge of the regulation, Appellant use his own words to explain how he so knew of his duty and what the duty specifically was. After denying any knowledge of this regulation at the time of his offense, the remainder of

Appellant's answers during his *Care* inquiry, and subsequent unsworn statement, did nothing to cure the substantial question as to what Appellant knew about his duty at the time of the offense.

Appellant stated on the record "Yes, Your Honor" to a question by the military judge that he "knew there were rules that [he] couldn't do what [he] did." Appellant admitted he "understood that most likely if [his] behaviors and stances came to light, that there would be some kind of consequences. What those were, [he] didn't know." These vague and evasive answers do nothing to show Appellant knew about any specific duty to refrain from actively advocating extremist ideologies and causes, especially in the light that he expressly denied knowing the regulation that created this duty. The charged duty by the Government has several specific and complex definitions and meanings not captured in Appellant's admissions.

When asked to be specific about what he knew related to his duty at the time of the offense, Appellant responded, "I was aware of proper workplace behavior and discussions and topics . . . *I did not realize that my anonymous statements online were in violation of any regulation.*" (Emphasis added). This statement by Appellant is not an admission of a willful violation of the duty charged. When the military judge tried to steer Appellant to say he had express knowledge he was to refrain from actively advocating extremist ideologies, Appellant again equivocated: "I understood I was doing something wrong, but I didn't know, specifically, what it pertained to." Finally, seeming to know these answers were insufficient to establish the requisite element of knowledge, the military judge asked a direct, legal conclusion question to Appellant if he agreed he "was aware that [he] was not allowed to actively advocate in supremist and extremist ideology," and Appellant replied, "Yes, Your Honor."

Such a direct, pointed and legally conclusory question, coupled with a mere "yes" from Appellant "does not satisf[y] the requirements of Article 45,[ UCMJ,] and R.C.M. 905." *Jordan*, 57 M.J. at 239. "[W]ithout any admission from [Appellant] to support" this single legal conclusion direct question, "mere conclusions of law recited by an accused . . . are insufficient to provide a factual basis for a guilty plea." *Id.* (footnote omitted) (quoting *Outhier*, 45 M.J. at 331). Nothing Appellant said in his stipulation of fact nor on the record, beyond a legally conclusory statement, satisfies this court Appellant knew of his duties at the time he committed the misconduct. Knowing he was "doing something wrong" is not the same as knowing the charged duty, especially considering the critical constitutional implications discussed *supra*.

Importantly, even after the military judge asked this single pointed legally conclusory question to Appellant, in his unsworn statement Appellant again regressed and highlighted his lack of knowledge of this duty. These unsworn statements undermined his previous acquiescence to the military judge's direct

19

question on knowledge, and like in *Saul*, left a substantial unresolved inconsistency that was not revoked or resolved. While the military judge "reopened" the inquiry after Appellant's backtracking of his knowledge of the duty, nothing in the supplemental questions by the military judge cured this issue.

After Appellant's unsworn statement, the military judge asked leading, legally conclusory statements of Appellant, and in the end Appellant's final words on the issue were that "even though [he] was anonymous, [he] did not have a constitutional right due to the fact that [he] was in the Air Force and held to a higher standard of speech." Such a statement, inaccurately summarizing both the charged duty Appellant had and his constitutional rights leaves us with significant doubt as to what Appellant's knowledge and understanding of his duty and the law was both at the time of the misconduct and at the time of his plea. Therefore, there is a substantial, unresolved conflict of fact as to Appellant's knowledge of his specific duty at the time he committed the offenses rendering his plea further improvident.

Finally, we note Appellant's discussion about his mental health during his unsworn statement raises additional concerns about his ability to form specific intent at the time of the offense, as is required in this case. Appellant alluded to significant mental health struggles during the charged timeframe, including that his "decision making was really inhibited," that he was not "remembering what [he] posted" and that he was in "a haze" during this time in his life. These statements by the accused warranted additional discussion and clarification by the military judge to ensure Appellant's plea was informed and provident. *Harris*, 61 M.J. 391.

## III. CONCLUSION

The findings of guilty for the Charge and its Specification and the sentence are **SET ASIDE**. A rehearing is authorized. The record is returned to The Judge Advocate General for further proceedings consistent with this opinion. We will complete our Article 66, UCMJ, 10 U.S.C. § 866, review when the record is returned to the court.

DOUGLAS, Senior Judge (dissenting):

I respectfully dissent. Specifically, I disagree with the majority's conclusion that there is one, or more, substantial bases in law to question Appellant's guilty plea.

I write separately for two reasons. First, when Appellant entered into a plea agreement with the convening authority, to include waiving all waivable motions, he waived the right to move the trial court to dismiss the specification

and charge for failure to state an offense and waived his right to challenge the same on the grounds that his speech is protected by the First Amendment. Second, Appellant's plea was provident, and the trial judge did not abuse his discretion when he accepted Appellant's guilty plea. The analyses are related, but as applied to Appellant's case, waiver and providency of the plea are distinct and separate analyses.

## I. WAIVER

### A. Background

#### 1. Appellant's Participation in Prohibited Activities

Appellant was convicted, in accordance with his pleas, of one charge and specification of willful dereliction of duty, on divers occasions, during a period of time that spanned over two years, for failing to refrain from actively advocating supremacist and extremist ideology and causes, as it was his duty to do, in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892.[1] While my colleagues provided Appellant's involvement in the prohibited activities later in their opinion, found *supra*, I think it is important to emphasize what Appellant's activities consisted of by his own admissions both in a stipulation of fact and during his providency inquiry at his court-martial.

Appellant participated in multiple group texts associated with a national white extremist group and subordinate groups. He shared and reposted videos and messages emblematic of Naziism. According to Appellant, these messages were "advocating for causes, advocating for violence."

Appellant associated himself with like-minded individuals. He met with these individuals at or near Spokane, Washington, "seven or more times."

Appellant unknowingly introduced an undercover Air Force Office of Special Investigations (OSI) agent to his group of friends. Appellant was heard to threaten those who enforce mask mandates. Appellant stated that he wanted to do more than just talk online. He wanted to "f[**]king kill people." He made racist statements and described black Americans as "an infestation." Appellant made antisemitic statements including, "I don't hate every single Jew without reservation. I just hate what they've done to Western civilization, and I hate their nature, and I hate them as a whole."

In addition to reposting messages in online group texts and vocalizing certain supremacist and extremist statements aloud in group settings, Appellant witnessed others damage public property with white supremacist graffiti and

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

stickers. Further, upon being interviewed by OSI, he admitted he had also placed a sticker in downtown Spokane, Washington, stating, "It's OK to be white." He explained he was concerned that the white race was dying out. Further, Appellant said he wanted to buy a suppressor, but not "legally." He discussed procuring body armor, including through an Air Force security forces associate.

### 2. The Providence Inquiry on Constitutional Grounds

On 3 October 2023, Appellant entered into a plea agreement with the convening authority; Appellant's plea was unconditional. Appellant agreed to plead guilty to the charge and its sole specification; agreed the charge and its sole specification would be referred to a special court-martial; agreed to elect trial by judge alone; agreed to "a reasonable stipulation of fact" to establish each of the elements of the offense; and agreed to waive all motions which may be waived under the Rules for Courts-Martial.

The agreed upon stipulation of fact consists of six pages, including 30 paragraphs. In it, several events occurring throughout the charged timeframe are detailed. The volume, breadth, and depth of which are not all recited here.

On 18 October 2023, during Appellant's guilty plea, the trial judge queried Appellant upon the 30 paragraphs in the stipulation of fact, reading them paragraph by paragraph and asking appropriate follow-up questions about the events detailed.

While the stipulation of fact did not address whether any of Appellant's crimes, charged as active advocacy of extremist and supremacist ideology and causes, were protected under the First Amendment,[2] the trial judge did query Appellant about these applicable rights during the providence inquiry.

> [Trial Judge:] So with that, I wanted to ask you[,] are you aware that you have certain rights under the First Amendment, namely freedom of speech and freedom of assembly?
>
> [Appellant:] Yes, Your Honor.
>
> [Trial Judge:] And have you had an opportunity to discuss your First Amendment rights and any potential defense your First Amendment rights could give rise to in this case with your defense counsel?
>
> [Appellant:] Yes, Your Honor.

---

[2] U.S. CONST. amend. I.

[Trial Judge:] Do you feel that your conduct – both that you've discussed with me and in the Stipulation of Fact – do you feel your conduct was constitutionally protected?

. . . .

[Appellant:] I understand there's a First Amendment, but I also understand there are more strict rules for service members, so no.

[Trial Judge:] So do you feel that the First Amendment in any way provides you a defense to the words and the actions that you took?

[Appellant:] No, Your Honor.

The trial judge then asked Appellant's trial defense counsel what motions they were not making pursuant to the plea agreement provision agreeing to waive all motions that may be waived under the Rules for Court-Martial.

[Trial Judge:] Defense Counsel, what motions are you not making pursuant to this provision of the plea agreement?

[Defense Counsel:] Your Honor, pursuant to the terms of the plea agreement, the defense is not making a motion to dismiss based on failure to state an offense, as well as [other motions].

. . . .

[Trial Judge:] Defense Counsel, did you give any consideration – you heard me talk with [Appellant] earlier on any potential challenge to the specification on constitutional grounds, or was that, perhaps, part of the motion to dismiss consideration, or could you articulate your thoughts on that for me –

[DC:] Yes, Your Honor. The motion to dismiss for failure to state an offense would have been rooted in constitutional concerns.

The trial judge also asked Appellant his perspective on the provision in the plea agreement agreeing to waive all motions that may be waived under the Rules for Court-Martial.

[Trial Judge:] [Appellant] your plea agreement states that you waive, or give up the right to waive all waivable motions. You heard your defense counsel articulate that they had specifically considered [other motions] and motions to dismiss for failure to state an offense, specifically, on First Amendment grounds. And then, obviously, you heard the discussion I just had with them on any other potential motions that they could have brought. I advise you that certain motions are waived, or given up, if your

23

defense counsel does not make that motion prior to entering your plea. Some motions, however, such as a motion to dismiss for lack of jurisdiction, for example, can never be given up.

Do you understand that this term of your plea agreement means that you give up the right to make any motion which by law is given up when you plead guilty?

[Appellant:] Yes, Your Honor.

[Trial Judge:] In particular, do you understand that this term of your agreement may preclude this court, or any appellate court, from having the opportunity to determine if you are entitled to any relief, based upon those motions?

[Appellant:] Yes, Your Honor.

. . . .

[Trial Judge:] Defense Counsel, which side originated the waiver of motions provision?

[DC:] The defense did, Your Honor.

[Trial Judge:] [Appellant], did you freely and voluntarily agree to this term of your agreement in order to receive what you believe to be a beneficial agreement?

[Appellant:] Yes, Your Honor.

The trial judge covered the constitutionality of Appellant's rights and determined that Appellant and trial defense counsel understood and still waived their rights to motions "rooted in constitutional concerns." The trial judge accepted Appellant's pleas of guilty to the charge and its sole specification.

Later, in the presentencing phase of Appellant's court-martial, the trial judge reopened the providence inquiry in response to Appellant's unsworn statement stating he posted messages anonymously.

[Trial Judge:] And, then, you later stated that when you were posting things online, you publicly never ID'd yourself or anything of that nature. I just want to make clear, again. You might remember earlier today we talked about that it has to be crystal clear when there is potential conflict between First Amendment constitutional protections and your duties as an Airman under Article 92. And in stating that, I just want to make clear[,] were you suggesting in any way that you felt that because you didn't identify yourself, because you were simply just posting things on the internet, that that was constitutionally protected behavior

that was not an offense under Article 92? Can you speak to me on that at all?

. . . .

[Appellant:] Your Honor, I understood that even though I was anonymous, I did not have a constitutional right due to the fact that I was in the Air Force and held to a higher standard of speech [inaudible].

For the first time on appeal, Appellant contends his crimes were protected by the First Amendment.

## B. Discussion

### 1. Law

We review a trial judge's decision to accept a guilty plea for abuse of discretion. *United States v. Riley*, 72 M.J. 115, 119 (C.A.A.F. 2013) (citing *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008)). "An abuse of discretion occurs when there is 'something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea.'" *Id.* (quoting *Inabinette*, 66 M.J. at 322).

"By entering a plea of guilty, the accused is not simply stating that he did the discrete acts described in the [charge sheet]; he is admitting guilt of a substantive crime." *United States v. Hardy*, 77 M.J. 438, 442 (C.A.A.F. 2018) (quoting *United States v. Broce*, 488 U.S. 563, 570 (1989)). An "unconditional plea of guilty waives all nonjurisdictional defects at earlier stages of the proceedings." *Id.* (internal quotation marks and citations omitted).

A challenge to a specification for failure to state an offense is a waivable motion and one that must be raised before the adjournment of the court-martial in that case. Rule for Courts-Martial (R.C.M.) 907(b)(2)(E).

There is a "presumption against the waiver of constitutional rights, and for a waiver to be effective it must be clearly established that there was an intentional relinquishment of a known right or privilege." *United States v. Smith*, 85 M.J. 283, 287 (C.A.A.F. 2024) (citing *United States v. Sweeney*, 70 M.J. 296, 303–04 (C.A.A.F. 2011)).

### 2. Analysis

At his court-martial, Appellant pleaded guilty, unconditionally, to willful dereliction of duty, by failing to refrain from actively advocating supremacist and extremist ideology and causes.

During his guilty plea inquiry, Appellant's trial defense counsel explained the Defense initiated the plea agreement provision, waiver of all waivable motions. Specifically, trial defense counsel articulated that one of the motions

waived was for the failure to state an offense, which he averred was "rooted in constitutional grounds." Appellant was asked, and he agreed, he was waiving a motion for failure to state an offense based upon his rights under the First Amendment, and agreed he understood its meaning and effect.

Recognizing that there are boundaries to waiving constitutional rights, the trial judge specifically asked Appellant if he had had a chance to speak with his trial defense counsel about "any" potential defenses to his crimes due to protections afforded under the First Amendment. Appellant informed the trial judge that he did have an opportunity to discuss his First Amendment rights and any potential defense to his First Amendment rights with his trial defense counsel, and by responding "no" to the trial judge's inquiry, Appellant was stating that he had no defense under the First Amendment. Applying our standard of review, the trial judge did not abuse his discretion when he accepted Appellant's guilty pleas after reviewing Appellant's plea agreement, his stipulation of fact, and the responses made by Appellant to the trial judge during his providence inquiry. If Appellant desired to challenge the criminality of his offenses through the lens of the First Amendment, and as applied to him as a servicemember, the time to challenge the Government's charge was prior to the conclusion of his court-martial. R.C.M. 907(b)(2)(E). Had Appellant challenged the Government's charge, there would have been a developed record. Then perhaps we could know which part, if any, of his active advocacy of supremacist and extremist ideologies and causes, were allegedly constitutionally protected. But since Appellant elected not to do so, we do not know. He waived the motion for failure to state an offense and specifically disavowed a defense under the First Amendment. I find his waiver to be effective because he intentionally relinquished a known right.[3] *Smith*, 85 M.J. at 287.

## II. PROVIDENT PLEA

### A. Background

Appellant was charged with willful dereliction of duty, in violation of Article 92, UCMJ. Willful dereliction of duty has three elements. After Appellant pleaded guilty to the charge, the trial judge correctly and completely explained the elements and definitions of the charge to Appellant.

First, Appellant had certain duties. Here, the duty charged was to refrain from actively advocating supremacist and extremist ideology and causes. A

---

[3] We have waiver "piercing authority" for misconduct committed before 1 January 2021. *See United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citation omitted). However, I would not pierce waiver for Appellant's crimes committed during the charged timeframe, but before 1 January 2021.

duty may be imposed by treaty, statute, regulation, lawful order, standard operating procedure, or custom of the Service. *MCM* pt. IV, ¶ 18.c.(3)(a). Here, the Government established Appellant's duty by regulation. In the stipulation of fact, Appellant specifically agreed Air Force Instruction (AFI) 51-508, *Political Activities, Free Speech and Freedom of Assembly of Air Force Personnel*, dated 12 October 2018, was a lawful general regulation and that he had a duty to obey the regulation.

Through this AFI, the Air Force prescribed the following duty:

> Military personnel must not actively advocate supremacist, extremist, or criminal gang doctrine, ideology, or causes, including those that advance, encourage, or advocate illegal discrimination based on race, creed, color, sex, religion, ethnicity, or national origin or those that advance, encourage, or advocate the use of force, violence, or criminal activity or otherwise advance efforts to deprive individuals of their civil rights.

AFI 51-508, *Political Activities, Free Speech and Freedom of Assembly of Air Force Personnel*, ¶ 3.4 (12 Oct. 2018).

Further, through this AFI, the Air Force prescribed the rejections of active participation in certain organizations:

> Military personnel must reject active participation in criminal gangs and in other organizations that [a]dvocate supremacist, extremist, or criminal gain doctrine, ideology or causes; [a]ttempt to create illegal discrimination based on race, creed, color, sex, religion, ethnicity, or national origin; [a]dvocate the use of force, violence, or criminal activity; or [o]therwise engage in efforts to deprive individuals of their civil rights.

AFI 51-508, ¶ 3.4.1.

Additionally, the Air Force provided definitions of supremacist and extremist ideology and causes applicable to the above proscribed duties. According to the AFI, "[a] supremacist doctrine, ideology, or cause is characterized by, but is not limited to, having a fundamental tenet of its nature that particular members of one race, color, gender, national origin or ethnic group are genetically superior to others." AFI 51-508, ¶ 3.4.2.3. "An extremist doctrine, ideology, or cause is characterized by, but is not limited to, a common belief which might otherwise be politically or socially acceptable, but that espouse the use or threat of force or violence to obtain their goals." AFI 51-508, ¶ 3.4.2.4.

Second, Appellant knew of his duties. Through Appellant's sworn statements provided to the trial judge during his guilty plea, Appellant articulated he knew of his duties several times.

[Appellant:] Between the dates of 7 February 2020 and 26 April 2022, I was involved in online group text chats and an online community of white extremists. I met with some of those individuals, and we also shot firearms, and we discussed our beliefs and plans and different ways to advocate for that ideology. My participation included posting messages, communicating with other people, reposting messages on social media, and advocating for those causes online. *At the time, I knew that as an Airman, that was not something that I was supposed to be engaged in.*

[Trial Judge:] [Appellant], did you have a duty to refrain from actively advocating supremacist and extremist ideology and causes?

[Appellant:] Yes, Your Honor.

[Trial Judge:] And how was that duty imposed?

. . . .

[Appellant:] Your Honor, I knew there were rules for what we are allowed to talk about as an Airman and as a representative of the Air Force. I was not aware of the specific instruction at the time, but now I am – I've been made aware.

. . . .

[Trial Judge:] So I believe – and, again, correct me if I'm wrong – when you are referencing an instruction or a regulation, you're talking about – in your Stip[ulation] of Fact, it talks about Air Force Instruction 51-508. Is that the regulation you are referencing?

[Appellant:] Yes, Your Honor.

[Trial Judge:] And you said that you didn't know that that existed, *but you still knew that there were rules that you couldn't do what you did. Is that right?*

[Appellant:] *Yes, Your Honor.*

[Trial Judge:] Could you talk to me a little bit more about that, as to what you knew?

[Appellant:] I understood that most likely if my behaviors and stances came to light, that there would be some kind of consequences. What those were, I didn't know.

. . . .

[Appellant:] Your Honor, I was aware of proper workplace behavior and discussions and topics. That was something that I was counseled on that I was made aware of at the time, and I did not realize that my anonymous statements online were in violation of any regulation. Does that answer your question, Your Honor?

[Trial Judge:] Partially. I appreciate that. When you say you didn't realize what you were posting online was violating any regulation, are you telling me that you didn't know that there was a specific regulation that was violated, but you still knew you had a duty not to, or are you telling me that you didn't think you were doing anything wrong at that point? Does that distinction make sense?

[Appellant:] Yes, it does make sense. I understood I was doing something wrong, but I didn't know, specifically, what it pertained to.

[Trial Judge:] And did you know, specifically, that although you couldn't cite me the regulation at that point, that you still had a duty as an Airman at that point not to be making those comments?

[Appellant:] Yes, Your Honor.

. . . .

[Trial Judge:] Do you agree that a duty to refrain from actively advocating supremacist and extremist ideology and cause[s] is a valid military duty that you had a duty to obey?

[Appellant:] Yes, Your Honor, I agree.

(Emphasis added).

Third, Appellant was willfully derelict in the performance of those duties during the charged timeframe. "Willfully" means intentionally. It refers to the doing of an act knowingly and purposely, specifically intending the natural and probable consequences of the act. *MCM*, pt. IV, ¶ 18.c.(3)(c).

The trial judge read to Appellant, as reflected in the record, the above prescribed duties and definitions from the AFI 51-508. These paragraphs were not referenced by nomenclature or restated in the stipulation of fact specifically. The trial judge asked Appellant more questions.

[Trial Judge:] Do you understand those definitions that I have read from AFI 51-508?

[Appellant:] Yes, Your Honor.

29

[Trial Judge:] And even though you weren't aware of [AFI] 51-508 at the time, *do you agree that you were aware that you were not allowed to actively advocate in supremacist and extremist ideolog*y?

[Trial Judge:] *Yes. Yes, Your Honor*.

[Trial Judge:] Talk to me, if you can, about the specification against you that says you actively advocated. Can you talk to me a little bit and explain how you actively advocated during this time period?

. . . .

[Appellant:] Your Honor, I had an anonymous account online that would repost posts from other extremist accounts advocating for causes, advocating for violence. I also, at one point, went out with other individuals to put stickers up in the form of activism. I also met with other people that had similar ideals, and we discussed how to further that agenda. I also tried to find other people to bring into those group chats at given points. Those are some of the examples of actively advocating that come to mind.

. . . .

[Trial Judge:] So I explained to you earlier that you're charged with willful dereliction that requires you to knowingly or intentionally fail to perform your duty. Do you agree that you knowingly and intentionally knew you had a duty and intentionally failed to do it?

[Appellant:] Yes, Your Honor.

(Emphasis added).

**B. Law**

We review a military judge's decision to accept a guilty plea for an abuse of discretion. *United States v. Blouin*, 74 M.J. 247, 251 (C.A.A.F. 2015) (citation omitted).

We apply a "substantial basis" test by determining "whether there is something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea." *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008).

The military judge may consider both the stipulation of fact and the inquiry with the appellant when determining if the guilty plea is provident. *United States v. Hines*, 73 M.J. 119, 124 (C.A.A.F. 2014).

"[W]hen a plea of guilty is attacked for the first time on appeal, the facts will be viewed in the light most favorable to the [G]overnment." *United States v. Arnold*, 40 M.J. 744, 745 (A.F.C.M.R. 1994) (citation omitted). We accept as true facts to which the parties stipulated in support of a guilty plea. *See United States v. Castro*, 81 M.J. 209, 212 (C.A.A.F. 2021) (citations omitted). This is so because "[u]nless properly withdrawn or ordered stricken from the record, a stipulation of fact that has been accepted is binding on the court-martial and may not be contradicted by the parties thereto." *Id.* at 211 (citation omitted).

An appellant bears the "burden to demonstrate a substantial basis in law and fact for questioning the plea." *United States v. Finch*, 73 M.J. 144, 148 (C.A.A.F. 2014) (quoting *United States v. Negron*, 60 M.J. 136, 141 (C.A.A.F. 2004)). When entering a guilty plea, the accused should understand the law in relation to the facts. *United States v. Care*, 40 C.M.R. 247, 251 (C.M.A. 1969).

The record of trial must show that the trial judge "questioned the accused about what he did or did not do, and what he intended." *Id.* at 253. This is to make clear to the trial judge whether the accused's acts or omissions constitute the offense to which he is pleading guilty. *Id.*

"If an accused sets up matter inconsistent with the plea at any time during the proceeding, the military judge must either resolve the apparent inconsistency or reject the plea." *United States v. Hines*, 73 M.J. 119, 124 (C.A.A.F. 2014) (internal quotation marks and citation omitted).

"This court must find a substantial conflict between the plea and the accused's statements or other evidence in order to set aside a guilty plea. The mere possibility of a conflict is not sufficient." *Id.* (internal quotation marks and citation omitted).

"A plea is provident so long as [an appellant] was convinced of, and was able to describe, all of the facts necessary to establish his guilt." *United States v. Murphy*, 74 M.J. 302, 308 (C.A.A.F. 2015) (internal quotation marks, citation, and alternations omitted). Moreover:

> [F]ailure to define correctly a legal concept or explain each and every element of the charged offense to the accused in a clear and precise manner is not reversible error if it is clear from the entire record that the accused knew the elements, admitted them freely, and pleaded guilty because he was guilty.

*Id.* (internal quotation marks, alteration, and citation omitted).

**C. Analysis**

While Appellant now claims on appeal that his crimes were protected by the First Amendment, I hold the position that he waived this challenge. However, Appellant did not waive review of the providency of his plea to the charge and its sole specification.

As to the elements of the offense, Appellant admitted and acknowledged the Air Force regulated a military duty to refrain from active advocacy of supremacist and extremist ideology and causes. Appellant agreed he knew of this duty as he had been counseled upon it. He knew as an Airman and "representative" of the Air Force, he had "rules" regarding what he was "allowed" to talk about. He knew that if his perspectives on these issues came to light, there would be consequences. Appellant stipulated and verbally explained to the trial judge the details of how he willfully, and repeatedly, over a span of more than two years, failed to refrain from this duty. While Appellant was not aware of AFI 51-508, he *was aware* that he was not allowed to actively advocate in supremacist or extremist ideology and causes. Further, the Government did not charge Appellant as to having knowledge of the AFI nor did they require its contents to be included in the stipulation of fact, only that Appellant had knowledge of the prohibited conduct itself. Appellant answered the trial judge by acknowledging that he knew there were rules that he should not do what he did; and the rules established by the Air Force in the AFI were those rules. Here, Appellant "knew the elements, admitted them freely, and pleaded guilty because he was guilty." *Murphy*, 74 M.J. at 308.

We turn to the question of whether Appellant set up a matter inconsistent with his plea at any time during the proceeding. *See Hines*, 73 M.J. at 124. I believe he did not. The majority is convinced Appellant was not aware of his duties, due to certain statements Appellant made in court, and regardless of the whole record. However, the Appellant is not required to know how to articulate by AFI or even paragraph his knowledge of his duties as an Airman. *United States v. Markley*, 40 M.J. 581, 582 (A.F.C.M.R. 1994).

The majority is concerned Appellant may have had mental health issues during the time he committed his charged crimes. The Government and Appellant stipulated, "[A]t the times and dates related to his criminal conduct, [Appellant was] able to appreciate the nature, quality, and wrongfulness of all unlawful conduct herein stipulated." Nonetheless, Appellant did explain his poor decision-making during the charged timeframe. However, the mental health issues Appellant discussed during his unsworn statement do not come close to raising the possibility of a mental disease or defect. *Unites States v. Harris*, 61 M.J. 391, 398 (C.A.A.F.). Instead, the Appellant used the unsworn statement opportunity, as many people do, to mitigate his criminality prior to sentencing. He discussed being in a "haze" after the death of a pre-term child, as well as

almost losing his wife to an illness while she was pregnant with their child. Appellant did not reference a specific mental health diagnosis, but even if he had, at most it might have raised only a "mere possibility" of a conflict with his plea. *United States v. Shaw*, 64 M.J. 460, 464 (C.A.A.F. 2007). Appellant did not set up a matter inconsistent with his plea, which would have required the trial judge to either resolve the apparent inconsistency or reject the plea.

Turning to the majority's concern that the trial judge did not sufficiently conform to the "heightened *Hartman*" plea inquiry requirements, I respectfully disagree. The majority primarily relies upon *Hartman* and *Kim* to set aside Appellant's guilty plea, because they believe the trial judge here did not meet his duty to ensure Appellant understood and appreciated the critical distinction "between what is permitted and what is prohibited" as related to his constitutional rights. *United States v. Kim*, 83 M.J. 235 (C.A.A.F. 2023); *United States v. Hartman*, 69 M.J. 467, 498 (C.A.A.F. 2011).

To better understand the "heightened *Hartman*" plea inquiry requirements, context is key. Hartman pled guilty to one charge of sodomy in violation of Article 125, UCMJ, 10 U.S.C. § 925 (2006). Hartman was charged with consensual sodomy in the presence of a (sleeping) third person. The United States Court of Appeals for the Armed Forces (CAAF) granted review on the issue of whether Hartman's conviction violated the due process clause of the Fifth Amendment. U.S. CONST. amend. V. Hartman had been charged with this violation of Article 125, UCMJ, after the United States Supreme Court decided *Lawrence v. Texas*,[4] and after the CAAF decided *United States v. Marcum*.[5] When the CAAF decided *Marcum*, CAAF set forth a "tripartite framework" for addressing *Lawrence* challenges within the military context. *United States v. Stirewalt*, 60 M.J. 297, 304 (C.A.A.F. 2004). The CAAF set aside Hartman's guilty plea because the trial judge who accepted the guilty plea did not follow the "tripartite framework." *Hartman*, 69 M.J. at 469. In the context of the changing legal landscape of consensual sodomy, as applied to military members, the "heightened *Hartman*" plea inquiry guidance set forth by our superior court is better understood.

The context of *Kim* is similarly helpful to understanding the guidance of the "heightened *Hartman*" plea inquiry requirements. Among other offenses, Kim pled guilty to indecent conduct in violation of Article 134, UCMJ, 10 U.S.C. § 934 (2018). Kim had conducted multiple searches on a pornographic website using the terms "rape sleep" and "drugged sleep," which formed the

---

[4] *Lawrence v. Texas*, 539 U.S. 558 (2003) (striking down a state statute "making it a crime for two persons of the same sex to engage in certain intimate sexual conduct" as violating the constitutional "right to liberty under the Due Process Clause").

[5] 60 M.J. 198 (C.A.A.F. 2004) (discussing the scope of *Lawrence*).

basis of his indecent conduct allegation. Kim admitted during his plea inquiry that this conduct was of a nature to bring discredit upon the armed forces. The CAAF granted review to resolve whether the trial judge had abused his discretion by failing to abide by the "heightened" plea inquiry requirements under *Hartman*. The First Amendment protection at issue in *Kim* was whether this behavior, conducting searches for materials involving "rape sleep" and "drugged sleep," was a violation for military members in light of the Supreme Court's 1969 decision in *Stanley v. Georgia*. 394 U.S. 557 (1969). In that case, the Supreme Court held "the mere private possession of obscene matter cannot constitutionally be made a crime." *Id.* at 559. The CAAF set aside Kim's conviction for indecent conduct because the trial judge did not follow the heightened plea inquiry requirements by not even asking about the First Amendment's application, if any, to his charge. *Kim*, 83 M.J. at 239.

Here, the trial judge, sua sponte, and repeatedly inquired into Appellant's perspective of whether the First Amendment provided "any" defenses to Appellant's charged offense. Appellant articulated, "No."

Even prior to engaging with Appellant on how his charged offenses might intersect with protections afforded him by the First Amendment, the trial judge explained the law to Appellant.

> [Trial Judge:] So I want to talk to you about the First Amendment a little bit. What the law tells me is when a charge against a service member may implicate both criminal and constitutionally protected conduct, the distinction between what is permitted and what is prohibited constitutes a matter of critical significance. And it says, "With respect to the requisite inquiry into the providence of a guilty plea" -- which is exactly what we're doing right now – "and Rule for Court-Martial 910, the discussion between the military judge and the accused must contain an appropriate discussion and acknowledgment on the part of the accused of the critical distinction between permissible and prohibited behavior."

> So with that, I wanted to ask you are you aware that you have certain rights under the First Amendment, namely freedom of speech and freedom of assembly?

Here, the trial judge conformed to the heightened *Hartman* plea inquiry requirements. Without a paradigm, or tripartite framework, the trial judge well and appropriately queried Appellant's trial defense counsel on waiving waivable motions. The trial judge well and appropriately queried Appellant numerous times, in a variety of ways, his perspective of the intersection, if any,

of his crimes, as a service member as compared with the protections, if any, under the First Amendment.

In a subsequent hearing on this case, or in any future case involving willful dereliction of the duties proscribed by the paragraphs identified *supra* from AFI 51-508, what should a trial judge do? The majority has no answers beyond, "do better." Should the trial judge inquire into the various categories of unprotected speech? And what about the freedom to assemble? What paradigm or framework does a trial judge have for that inquiry? In a guilty plea, with no evidence the Appellant believed any of his crimes were protected by the First Amendment, with what information can the trial judge pursue a heightened inquiry? In this case, the trial judge could not have asked what the majority appears to believe was necessary—Appellant, which of your posts, statements, and, or, active advocacy actions, were permitted by the First Amendment, and which were prohibited? Or perhaps the trial judge should have asked Appellant, what did you understand at the time of your actions were permitted actions, and what did you understand at the time of your actions were protected? The trial judge could not have asked these questions because according to the Appellant, and Appellant's trial counsel, all of Appellant's charged offenses were crimes under Article 92, UCMJ.

Beyond asking about the First Amendment, why is the burden on the trial judge to inquire more? Did the legal landscape change, providing new guidance to a trial judge of how the First Amendment applies to service members since *Hartman* and *Kim*? If not, then the majority owes a paradigm or framework for trial judges to comply.

The burden is on the Appellant. An appellant bears the "burden to demonstrate a substantial basis in law and fact for questioning the plea." *Finch*, 73 M.J. at 148. When entering a guilty plea, Appellant should understand the law in relation to the facts. *Care*, 40 C.M.R. at 251.

Appellant, in his brief, offers no answer to which of his conduct was constitutionally protected and which was prohibited. Instead, on appeal, Appellant claims all of his conduct was protected under the First Amendment, but without explaining how. How are his words and actions protected under the First Amendment?

In my opinion, Appellant has not met his burden. There is no substantial conflict in law between Appellant's plea and the First Amendment. Therefore,

I find that the trial judge did not abuse his discretion in finding Appellant's plea to be provident.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court